**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>     vs.<br><br>GLOBANT S.A., MARTIN MIGOYA, JUAN IGNACIO URTHIAGUE, and PATRICIA POMIES,<br><br>              Defendants. | No.<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL SECURITIES LAWS**

Plaintiff Ohio Carpenters' Pension Fund ("Ohio Carpenters"), individually and on behalf of all others similarly situated (the "Class"), by its undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes, among other things: (i) review and analysis of regulatory filings made by Globant S.A. ("Globant" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases, conference calls, and media reports issued by and disseminated by Globant; (iii) review of other publicly available information concerning Globant; and (iv) interviews with former Globant employees.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired Globant common stock between February 15, 2024 and August 14, 2025, inclusive (the "Class Period"), against Globant and certain of its officers and executives, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Globant is a Luxembourg-incorporated international technology company that provides digital consulting and related services. Globant was founded in Argentina, and its workforce is largely based in Latin America. Before 2023, Globant focused on providing services to clients in the United States. In mid-2023, Globant announced a $1 billion strategic pivot to increase its Latin American business. Throughout the Class Period, Globant touted to investors the success of its Latin American pivot and the strength of its Latin American operations, as well as heralded itself as a market leader and employer of choice in the region.

3.      Unbeknownst to investors, Globant's Latin American strategy was not successful. In reality, Globant was facing pervasive problems with its Latin American operations, including declining demand for its services, client defections, and project cancellations.  Globant also froze wages for its employees in Mexico and Argentina, further harming its Latin American operations and leading to widespread employee turmoil and degraded client services.  When the market learned the truth about Globant's Latin American operations over the course of 2025—including a marked decline in Latin American revenue—the Company's stock price declined precipitously.

4.      As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

7.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, Globant is listed and traded on the New York Stock Exchange ("NYSE"), which is based in this District.  The Company also maintains at least one office in this Judicial District at 251 Park Avenue, New York, New York.

8. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## PARTIES

9. Plaintiff Ohio Carpenters, as set forth in the accompanying certification, incorporated by reference herein, purchased Globant securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

10. Defendant Globant is a Société Anonyme (public limited company) organized under the laws of Luxembourg, with its principal executive offices located at 37A, Avenue JF Kennedy, L-1855, Luxembourg. The Company's common stock is listed and trades on the NYSE under the ticker symbol "GLOB."

11. Defendant Martin Migoya ("Migoya") has served as Globant's Chief Executive Officer ("CEO") and Co-Founder since it was a startup in 2003.

12. Defendant Juan Ignacio Urthiague ("Urthiague") has served as Globant's Chief Financial Officer ("CFO") since 2018.

13. Defendant Patricia Pomies ("Pomies") served as Globant's Chief Operating Officer ("COO") from 2021 to July 2025.

14. Defendants Migoya, Urthiague, and Pomies (together, the "Individual Defendants" and together with the Company, "Defendants") because of their positions with Globant, possessed the power and authority to control the contents of Globant's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Globant's SEC

4

filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Globant, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

15. Globant is an international technology services company that provides digital consulting, software development, and IT outsourcing services to multinational corporations across a variety of sectors. The Company traditionally derived most of its revenue from the United States, giving it a competitive advantage because of its comparatively less expensive Latin American workforce.

16. In mid-2023, however, the Company announced a $1 billion strategic pivot to Latin America. Part of this expansion was Globant's December 2023 acquisition of Iteris—a Brazilian digital consulting company with more than 600 employees.

17. Throughout the Class Period, Defendants boasted to investors about Globant's "prominence" in Latin America, repeatedly highlighting the "growth" and opportunities for "significant[] expan[sion]" in the region. Defendants also repeatedly drew focus to the Company's "significant investments in Mexico and Brazil, the 2 largest economies [that were] responsible for 38% of Globant's revenue in the region." When discussing the "macroeconomic environment" in Latin America, Defendant Migoya emphasized that it was "pretty healthy" and that inflation in the region was "coming down very, very fast."

18.     On the operations side, the Company highlighted its presence "[a]s the only global tech player" from the region, stating that "[i]n Latin America, the IT services sector [was] expected to grow 11% in 2024."  The Company also maintained that demand in Latin America was "very, very high" and that Globant was "continu[ing] hiring in many . . . countries" and was "very strong in LatAm."  Globant's COO echoed this, saying the Company was "focusing" on "organic growth" in the region and that "[t]he teams" there were "more than ready to grow."

19.     Unbeknownst to investors, Globant's Latin American strategy was failing.  Rather than growing its Latin American business, Globant was facing declining demand for its services in Latin America, client defections, and project cancellations.  Globant's high-profile acquisition of Iteris in Brazil was troubled, highlighted by former Iteris clients leaving because of Globant's high hourly rates and a failure to properly integrate Iteris and its former employees.

20.     Globant also froze wages for its employees in Mexico and Argentina.  Because of the high inflation in those countries, a wage freeze was a sign of desperation and amounted to a wage cut for its employees.  These wage freezes further harmed Globant's operations and led to widespread turmoil and employee unrest and further degraded the Company's ability to deliver satisfactory work to its clients.  In an attempt to retain clients, Globant began laying off employees and decreasing the number of team members that were staffed on projects in Latin America.

21.     In February 2025, the market first began to learn about the problems with Globant's Latin American operations, when it announced disappointing Latin American results and, for the first time, said there was weakness in the region in 2024.  Following this news, Globant's stock price plummeted by $58.45 per share, nearly 28%, from a closing price of $210.17 per share on February 20, 2025, to a closing price of $151.72 per share on February 21, 2025.

22.     On May 15, 2025, investors were given slightly more insight into Globant's shortcomings in Latin America when the Company reported disappointing first quarter ("Q1") 2025 results.  Globant disclosed lower than expected growth in Latin America and noted Latin American revenue declined 9% year-over-year.  Defendants also addressed the "challenging macroeconomic and geopolitical context" in Latin America that was affecting "spending patterns among some of [its] largest customers."  Following this news, Globant's stock price declined by $31.37 per share, more than 23%, from a closing price of $132.84 per share on May 15, 2025, to a closing price of $101.47 per share on May 16, 2025.

23.     Finally, the failure of Globant's Latin American expansion was fully revealed on August 14, 2025, when the Company reported mixed second quarter ("Q2") 2025 results.  The Company disclosed that it had reduced its headcount by 2% in Q2, or about 1,000 employees, and taken a $47.6 million restructuring charge.  With respect to Latin America, Defendants stated that "after going down for a number of quarters, this [was] the Q1 [it was] sequentially up," which "show[ed] like a stabilization" that Globant was "seeing and [] making progress towards the end of the year—for the rest of the year, in" Latin America.

24.     Later on the call, Defendants discussed the "deterioration" in Brazil and Mexico throughout 2024 and 2025:

> Argentina is probably the best performing country around this time in the region. We start to see recovery in Brazil, Peru and Mexico.  And they are not all of them growing, but we are not seeing the deterioration that we saw, for example, in Brazil and Mexico earlier this year or late last year.  So, we see the stabilization there, some recovery in the case of Mexico and a very strong Argentina.

25.     This was the first time investors learned that headcount in Latin America had declined "for a number of quarters," in stark contrast to the Company's previous glowing statements about "growth" and "expansion" in the region.  Moreover, this was the first time the Company fully addressed the "deterioration" of its operations in Brazil and Mexico throughout

2024.  Following this news, Globant's stock price dropped nearly 15% ($11.66 per share) from a closing price of $78.12 per share on August 14, 2025, to a closing price of $66.46 per share on August 15, 2025.

## FALSE AND MISLEADING STATEMENTS

### I.   FEBRUARY 15, 2024 Q4 2023 EARNINGS CALL

26.   Globant held its Q4 2023 Earnings Call on February 15, 2024.  During the call, Defendant Migoya touted Globant's prominence and investments in Latin America.  Migoya stated:

> Our prominence in Latin America, our home region, is particularly beneficial right now as more of the biggest companies choose this region due to its proximity, multilingualism, and adaptability.  In the past months, we have made significant investments in Mexico and Brazil, the 2 largest economies and responsible for 38% of Globant's revenue in the region because we are eager to take up this demand.  In Mexico over the past year, we have established a new team specifically dedicated to life sciences to address the fundamental changes and growth of the sector in the region.  In Brazil, we have almost doubled our team over the past year, betting high on keeping our leadership in enterprise applications, especially Salesforce, and reinforcing digital transformation projects with the acquisition of Iteris.  We are optimistic about our future expansion this year as we see a robust business pipeline and organization's IT expenditures recovering compared to last year.

27.   When asked during the Q&A portion of the call about "the impact of Argentina devaluation," Defendant Urthiague stated:

> With regards to the first question, when we look at the impact of licenses and the situation in Argentina, we estimate that between $15 million to $20 million.  There is an ongoing renegotiation of contracts that we don't know where that's going to end, in some cases.

28.   One analyst on the call mentioned that it seemed like Globant was "going to be investing a bit more in Mexico and Brazil" and asked "[h]ow big" this could be for Globant.  In response, Defendant Migoya highlighted the importance of Latin America to Globant's business and the opportunity for expansion in the region, saying:

8

So Latin America, in my opinion, it would be a very important place moving forward, strategically speaking, for the U.S. and for North America in general. So, I believe that Latin America is a central place, not just for us to deliver, but also to keep on evolving our business. So, as you have seen, with the acquisition of Iteris, we're playing again in Brazil. And I believe that kind of things will keep on going, and we will keep on insisting on trying to expand our footprint in Latin America. So again, it's not just an untapped—still untapped place in terms of delivery, but also a market that is improving a lot and that will keep on gaining strategic importance for the whole world. So, I believe that, that's Globant's answer to what's going on, on a geopolitical way in the world. And we are very lucky to have this positioning, but we are taking advantage of that, and we'll keep on investing and having an increase in our presence there.

29.     Defendant Urthiague added to this, emphasizing the revenues that Latin America generated for Globant and the Company's "ability to grow" in the region. He stated:

No, what I was going to say is Latin America is about 22% of our revenues. When we look at Brazil and Mexico, those are huge economies, very, very large markets, and they are not even the biggest market for us within Latin America. So that means that the opportunity that we have to significantly expand our presence in the region is just there. They are very large companies that are growing very, very nicely, some of which we named during the earnings call where we are really, really performing very, very well. And we see the same needs and the same investment— type of investments in those companies and the ones that we are seeing in the U.S. and in Europe. So, we are very confident about our ability to grow in Latin America.

30.     Finally, when asked "whether there [were] any particular verticals or large client considerations that [were] driving [] modest quarter-over-quarter decline," Defendant Urthiague stated:

Yes. Part of the—I mean, the decline is mainly explained, as I mentioned before, by the one-off licenses that we had during Q4 that are not happening again into Q1 and the impact of the depreciation of the Argentinian currency that happened, it was 120% depreciation that happened in December. Basically, that had an impact on those contracts that are in pesos that they have indexes, but they go over time until you recover basically the same level of revenues that you had before.

31.     The statements set forth above in ¶¶27-31 were materially false and/or misleading because Globant's Latin American operations began experiencing turmoil in late 2023. Latin America was not, as Defendants claimed, a "particularly beneficial" region that would allow for

9

the "ability to grow" Globant's business.  Nor was the market in Latin America "stable" or "improving a lot."  In truth, Globant was facing decreasing demand across Latin America and had frozen wages in both Argentina and Mexico in late 2023 and Latin American clients were reducing and cancelling their projects with the Company.  Moreover, it was misleading for Globant to discuss the effects of the depreciation of the Argentine currency on its project contracts without disclosing that it had frozen the wages of its Argentine employees and that, because of currency depreciation, those wage freezes amounted in practical terms to wage cuts.

## II.    FEBRUARY 29, 2024 ANNUAL REPORT (FORM 20-F)

32.    In its Annual Report ("20-F"), filed with the SEC on February 29, 2024, Globant touted the Company's strategy of expanding its "[g]lobal delivery with access to deep talent pool," stating:

> A key element of our strategy is to expand our delivery footprint, including increasing the number of employees that work onsite at our clients or near client locations.  We will continue to focus on expanding our global delivery footprint to gain access to additional pools of talent to effectively meet the demands of our clients.

33.    The Company also highlighted the importance it placed on employee retention: "People are one of our most valuable assets.  Attracting and retaining the right employees is critical to the success of our business and is a key factor in our ability to meet our client's needs and the growth of our client and revenue base."

34.    Under the heading "Attraction," Globant again emphasized the importance of employee retention to its business operations, stating:

> Employee retention is one of our main priorities and a key driver of operational efficiency and productivity.  We seek to retain top talent by providing the opportunity to work on cutting-edge projects for world-class clients, a flexible work environment, training and development programs, and non-traditional benefits.  The total attrition rate among our Globers was 8.1%, 16.7% and 18.7% for the years ended December 31, 2023, 2022 and 2021, respectively.

10

35. The statements set forth above in ¶¶33-35 were materially false and/or misleading because Globant was not focused on "[a]ttracting and retaining" employees or hiring "additional pools of talent to effectively meet the demands of [its] clients." In reality, Argentine and Mexican employees' salaries were frozen, and the depreciation of Argentina's currency continued to erode employee purchasing power. As a result, there was widespread employee unrest in Globant's Latin American operations.

### III. MAY 16, 2024 Q1 2024 EARNINGS CALL

36. Globant held its Q1 2024 Earnings Call on May 16, 2024. During the call, Defendant Migoya emphasized the "benefit" of Globant's presence in Latin America and focused on the strength of the Company's workforce in the region. Defendant Migoya stated:

> With our diverse capabilities and authentic culture, we have become experts in growing our market share. Geopolitically speaking, we benefit from our geographic footprint with a leading presence in Latin America. It's a region free from international security threats as well as being democratically vibrant, culturally open, entrepreneur focused and with no religious conflicts. All of this has put us in a forefront position, outpacing other players in the industry. . . . Our fourth growth driver is our opportunities presented by our geographic scale. Now in 33 countries, we have the right presence in both talent and client markets that are resilient and growth oriented in this time of macroeconomic and geopolitical uncertainty. First, Latin America, the region where we were born and currently home to 69% of our workforce. In Latin America, the IT services sector is expected to grow 11% in 2024. By 2027, the region's 5,000 largest companies may spend an estimated 25% of their budget on IT according to Gartner. As the only global tech player from here, we already have a presence in 14 out of the top 15 cities for technology talent, and we are the employer of choice in the region.

37. The foregoing statements were materially false and/or misleading because Globant was not in a "forefront" position in Latin America, nor was it "outpacing other players in the industry." In truth, Globant was facing decreasing demand across Latin America and had frozen wages in both Argentina and Mexico in late 2023 and Latin American clients were reducing and cancelling their projects with the Company. It was also misleading for Globant to describe itself

as the "employer of choice" in Latin America without disclosing the widespread employee unrest occasioned by Globant's wage freezes in Argentina and Mexico.

38.    Later on the call, Defendant Urthiague was asked how he "expect[ed] the developers' cost to be impacted" in Argentina.  Defendant Urthiague responded:

> Yes.  So, things are improving in Argentina.  They are getting more stable.  Of course, back in December, there was a depreciation that, as we discussed in the last quarter, had an impact on our Q1 revenues.  The impact was around $15 million in that quarter.  We already closed around $10 million of those $15 million.  So, we still have about $5 million in our Q2 numbers that depending on each negotiation with our customers will get fully sold or partially sold, but we are -- we made very, very good progress compared to where we were back in towards the end of December. Customers understood the situation.  In terms of the impact on costs, in our industry in Argentina, salaries tend to be dollarized so they tend to follow the U.S. dollar.  So, it doesn't really change much the situation because salary has got a very good impact back in December.  Now inflation is going a little bit faster than currency devaluation.  So, it's offsetting part of that benefit back in December.  But all in all, we are not expecting big changes on that front in Argentina.

39.    The foregoing statements were materially false and/or misleading because, Globant employee salaries in Argentina had been frozen since late 2023.  Moreover, the Company paid its Argentine employees in a combination of U.S. dollars and local currency.  Since the value of the U.S. dollar in Argentina remained flat in 2024, while Argentina experienced double-digit inflation, Globant employee's purchasing power was severely diminished.  In stark contrast to Defendants' claim that "salary ha[d] a very good impact" on the situation in Argentina, Globant's Argentine employees had effectively had their salaries cut, creating significant problems in the Company's Argentine operations.

## IV.    AUGUST 15, 2024 Q2 2024 EARNINGS CALL

40.    Globant held its Q2 2024 Earnings Call on August 15, 2024.  During the call, Defendant Urthiague framed the depreciation of Latin American currencies as a positive for the Company, saying:

So, as you said, we are reiterating our constant currency growth for the year at 15.9%.  In dollar terms, it's going to be 15.2%.  The reason for that was the depreciation in Colombia and Mexico primarily and a little bit in Brazil as well.  In terms of—I mean at the same time that this has impacted our revenue guidance from last quarter, it has also benefited us from the cost side, so on the margins.

41.     When asked about growth in "billable heads in the second half of the year," Defendant Urthiague stated the Company expected sequential growth and reiterated that Latin America was "a great place to be":

So yes, we are expecting to continue with sequential growth in terms of head count. In second quarter, IT professionals grew by about 200 net additions, and we expect to continue having positive net additions for the rest of the year.  In terms of regions, we have seen—we are seeing Argentina, Colombia and India as well showing good growth.  And it's a reflection of our position in those markets and us being the most relevant player in Latin America.  And with all the geopolitical noise that is happening around the world, Latin America continues to be a great place to be, and we are the company that somehow leads in that market.

42.     One analyst asked Defendant Pomies whether "there could be—at some point, an increase back on the attrition rate or the demand for developers."  Defendant Pomies replied:

Yes.  Well, what we are seeing right now in terms of the attrition, as you mentioned, is pretty low right now.  Of course, it has been raising a little from the last quarter, but we're still in very low rates.  What we are seeing is that the demand is still very, very high for us.  So, we continue hiring in many of the countries that Juan explained before.  We are very strong in LatAm as we have been in the last couple of years.  And of course, India is another of the places that where we're growing. In terms of the people, even what we are seeing for the rest of the year is much pretty stable numbers and probably—I mean we—of course, the market is still growing, as you mentioned.  But we have a great culture that people are staying with—they're very happy in all the polls and the interviews that we are making with our Globers, and the culture that we have is really appealing for the new generations and the engineers and talents and designers.  So I think that from Globant's perspective, I mean, these numbers are pretty stable, and we continue doing different kind of things in order to have the same kind of numbers that you are seeing now.

43.     The statements set forth above in ¶¶41-43 were materially false and/or misleading because Globant's Latin American operations continued to deteriorate through August 2024. Despite Defendants' statements that Argentina was showing "good growth," wages continued to

be frozen—and thus effectively cut, given the inflation rate. Latin America was also not, as Defendants claimed, poised to experience "sequential growth" or "very strong." In truth, due to declining client demand and the Company's increased costs, Globant was reducing the number of team members working on projects so that Globant could retain clientele. In addition, Latin American clients were reducing and cancelling their projects with the Company.

## V.    NOVEMBER 14, 2024 Q3 2024 EARNINGS CALL

44.    Globant held its Q3 2024 Earnings Call on November 14, 2024. When asked on the call how investors should "think about employee growth going forward and the utilization rate," Defendant Urthiague stated:

> So, in terms of employee growth, you're going to see another quarter of net additions in Q4. We are hiring probably mostly in Latin America, in India and a little bit less in Eastern Europe. But overall, we are hiring in the 3 regions. Again, you should keep on expecting positive net additions in terms of—and probably a little bit faster than Q3.

45.    One analyst said they "wanted to get a little bit more color on the growth in Latin America and Europe specifically" and asked if Defendant Pomies could help understand how "these 2 geographies [were] doing." Defendant Pomies again emphasized the growth in Latin America, saying:

> I can explain the thing about—well, in terms of LatAm, as we have been explaining before, we split the region in 2 right now. We put 2 heads there, one in Brazil and the other one in Mexico. What we are seeing there is that we are slightly growing year-over-year now. We'll start growing faster. In terms of the financial vertical, it's getting better there. And some other, consumer and retail, are growing fast. . . . And in terms of the M&A strategy, as you know, we are all the time looking for the best talent and opportunities. Right now, what we are seeing is what we have is in the pipeline is okay. We are, right now, great—in a great scenario. Probably, I mean, we are looking for some new spaces all the time. Of course, also in LatAm in Europe. Mainly, what we are focusing these days is in organic growth there also.

46.    Later on the call, when asked about the Globant's "head count geographical mix," Defendant Urthiague stated:

14

Again, Latin America is our home market.  It will continue to be our main region, but other—I mean we are going to be more balanced going into the future with a larger Asia and eventually with a larger Eastern Europe, which today, it's a very, very small part of our business.

47.    The statements set forth above in ¶¶45-47 were materially false and/or misleading because the reality of Globant's operations in Brazil and the rest of Latin America was different than what the Company told investors.  Despite Defendants' statements that Globant would "start growing faster" in Brazil, the Company's acquisition of Iteris was a failure.  Iteris employees were never given promised salary and benefit increases that were intended to match those of legacy employees.  On the operations side, Globant's rates in Brazil were too high for the local market and the Company was experiencing severe problems with the quality of its work.  While client service was prioritized at Iteris, at Globant, client service was lackluster.

48.    In addition to issues with Globant's Brazilian operations, the Company's operations in Argentina continued to falter.  Salaries were still frozen.  The Computer Trade Association formally petitioned Globant's CEO for urgent salary increases and freedom of association but received no response.  And in October 2024, workers alleged that the Company blocked unionization efforts and fired an employee for creating a WhatsApp group to discuss wages.

## THE TRUTH BEGINS TO EMERGE

49.    The truth slowly emerged through two partial corrective events during 2025 that gave investors a glimpse into the significant problems facing Globant's Latin American expansion.

## I.    FEBRUARY 20, 2025 DISCLOSURES

50.    The market first began to learn of the issues with Globant's expansion in Latin America when the Company missed its Q4 2024 guidance.  Globant reported a 1.3% decrease in Latin American revenue and, as a result, offered more muted first quarter 2025 guidance.  During Globant's earnings call that same day, Defendant Migoya revealed that the "situation" in Latin

15

America during 2024 was "a little bit rocky . . . because of the political turmoil and different things that happened in Brazil and in Colombia, mainly." When asked about "headwinds" in Latin America, Defendant Urthiague echoed this saying, "there was a lot of political noise in Q4."

51. This partial correction was the first time Globant gave investors insight into the problems it had in Latin America in 2024. But it did not fully reveal the pervasiveness of the issues troubling the Company's Latin American expansion.

52. Following this news, Globant's stock price plummeted by nearly 28% ($58.45 per share) from a closing price of $210.17 per share on February 20, 2025, to a closing price of $151.72 per share on February 21, 2025.

## II. MAY 15, 2025 DISCLOSURES

53. On May 15, 2025, Globant reported disappointing Q1 2025 results. The Company announced lower than expected growth in Latin America and described "a challenging macroeconomic and geopolitical context" affecting the "spending patterns among some of [Globant's] largest customers," particularly in Latin America. Defendant Migoya disclosed "a slower pace of pipeline conversion in the U.S." and noted that "growth in some countries in Latin America [was] lower than expected." Globant also disclosed that its Latin American revenue declined 9% year-over-year, "with notable contractions in Mexico and Brazil." As the Company put it, "Mexico [is] suffering. Brazil is suffering."

54. While this partial correction disclosed more information about Globant's failing expansion, the magnitude of the problems facing the Company's Latin American operations was still concealed.

55. Following this news, Globant's stock price declined by $31.37 per share, more than 23%, from a closing price of $132.84 per share on May 15, 2025, to a closing price of $101.47 per share on May 16, 2025.

16

**THE TRUTH IS FULLY REVEALED**

56.    On August 14, 2025, Globant fully disclosed the true extent of its failures in Latin America.  Reporting mixed Q2 2025 results, Globant announced that it had reduced its headcount by 2% in Q2, or about 1,000 employees, and taken a $47.6 million restructuring charge.

57.    On its earnings call that same day, Globant said that "after going down for a number of quarters, this [was] the first quarter [headcount was] sequentially up," which "show[ed] like a stabilization," that Globant was "seeing and [] making progress towards the end of the year – for the rest of the year, in" Latin America.  Later on the call, the Company explained that:

> Argentina is probably the best performing country around this time in the region. We start to see recovery in Brazil, Peru and Mexico.  And they are not all of them growing, but we are not seeing the deterioration that we saw, for example, in Brazil and Mexico earlier this year or late last year.  So, we see the stabilization there, some recovery in the case of Mexico and a very strong Argentina.

58.    On this news, Globant's stock price fell nearly 15% ($11.66 per share) from a closing price of $78.12 per share on August 14, 2025, to a closing price of $66.46 per share on August 15, 2025.

**CLASS ACTION ALLEGATIONS**

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Globant common stock during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Globant common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be

17

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Globant or its transfer agent and may be notified of the pendency of this action by mail or electronic means, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and prospects of Globant; and

    c.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

18

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

65. The market for Globant's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Globant's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's securities and market information relating to Globant, purchased Globant securities and have been damaged thereby.

66. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Globant's securities, by issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Globant's business, operations, and prospects as alleged herein.

67. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made, a series of materially false and/or misleading statements about Globant's business, operations, and prospects. These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the Company's securities

19

to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

68.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

69.     During the Class Period, Plaintiff and the Class purchased Globant's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

70.     As alleged herein, Defendants acted with scienter since Defendants (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Globant, their control over, and/or receipt and/or modification of Globant's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential propriety information concerning Globant, participated in the fraudulent scheme alleged herein.

20

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE MARKET DOCTRINE)

71. The market for Globant's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Globant's securities traded at artificially inflated prices during the Class Period. In mid-February 2025, the Company's shares traded at over $210 per share. Plaintiff and other members of the Class purchased the Company's securities relying upon the integrity of the market price of Globant's securities and market information relating to Globant and have been damaged thereby.

72. During the Class Period, the artificial inflation of Globant's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made, or caused to be made, materially false and/or misleading statements about Globant's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Globant and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's securities. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

73. At all relevant times, the market for Globant's securities was an efficient market for the following reasons, among others:

    a.    Globant's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    b.    as a regulated issuer, Globant filed periodic public reports with the SEC;

      c.     Globant regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

      d.     Globant was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace.

74. As a result of the foregoing, the market for Globant's securities promptly digested current information regarding Globant from all publicly available sources and reflected such information in Globant's securities price. Under these circumstances, all purchasers of Globant's securities during the Class Period suffered similar injury through their purchases of Globant's securities at artificially inflated prices and a presumption of reliance applies.

75. A Classwide presumption of reliance is also appropriate in this action under the Supreme Court's holding in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

76.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Globant who knew that the statement was false when made.

**FIRST CAUSE OF ACTION**
**Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

77.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

23

79.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Globant common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Globant common stock and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

80.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Globant common stock.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Globant's business, operations, and prospects.

81.     By virtue of their positions at Globant, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and other members of the Class, or, in the alternative, Defendants acted

24

with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

82.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Globant, the Individual Defendants had knowledge of the details of Globant's internal affairs.

83.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Globant. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Globant's business, operations, and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Globant common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Globant's business, operations, and prospects which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Globant common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

84.     During the Class Period, Globant common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and

25

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Globant at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Globant common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Globant common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

85. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CAUSE OF ACTION**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

87. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88. During the Class Period, the Individual Defendants participated in the operation and management of Globant, and conducted and participated, directly and indirectly, in the conduct of Globant's business affairs. Because of their senior positions, they knew the adverse non-public information about Globant's business, operations, and prospects alleged herein.

89. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Globant's

26

financial condition and results of operations, and to promptly correct any public statements issued by Globant which had become materially false or misleading.

90.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Globant disseminated in the marketplace during the Class Period concerning Globant's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Globant to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Globant within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Globant common stock.

91.     Each of the Individual Defendants, therefore, acted as a controlling person of Globant.  By reason of their senior management positions and/or being directors of Globant, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Globant to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Globant and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

92.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Globant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

27

B.      awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      awarding such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.


DATED: April 24, 2026                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Thomas L. Laughlin, IV
Thomas L. Laughlin, IV
Donald A. Broggi
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
dbroggi@scott-scott.com

Jacob B. Lieberman
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 S. Main Street
Colchester, CT 06415
Telephone: (860) 537-5537
jlieberman@scott-scott.com

*Counsel for Plaintiff Ohio Carpenters*
*Pension Fund*