**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OHIO CARPENTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GLOBANT S.A., MARTIN MIGOYA, JUAN IGNACIO URTHIAGUE, and PATRICIA POMIES,<br><br>Defendants. | Case No. 1:26-cv-03405<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMAND** |

**AMENDED CLASS ACTION COMPLAINT FOR**
**<u>VIOLATIONS OF FEDERAL SECURITIES LAWS</u>**

Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and The Office of the Treasurer as Trustee for the State of Connecticut Retirement Plans and Trust Funds (together, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief are based upon, *inter alia*, (a) regulatory filings made by Globant S.A. ("Globant" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) analyst reports, media reports, Company conference call transcripts, Company press releases and publications, and other publicly available information about Globant and the industry in which it operates; and (c) investigative interviews with former Company employees having first-hand knowledge of the Company's business. Lead Plaintiffs believe that substantial additional evidentiary support for the allegations set forth herein will be uncovered after the opportunity to conduct discovery.

## I. SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired shares of Globant common stock between February 15, 2024 and August 14, 2025, inclusive (the "Class Period"), and asserts claims for damages under the Securities Exchange Act of 1934, 15 U.S.C. §78a, *et seq*. (the "Exchange Act") against Defendants Globant, its Chief Executive Officer Martin Migoya ("Migoya"), its Chief Financial Officer Juan Ignacio Urthiague ("Urthiague"), and its former Chief Operating Officer Patricia Pomies ("Pomies").

2. Globant is a Luxembourg-incorporated technology service provider founded in 2003 in Buenos Aires, Argentina. Globant operates as a technology engineering and digital design firm for large corporate clients across the world and across major industries including financial

services, healthcare, media, and travel. Rather than sell pre-packaged software, Globant assists businesses with "digital transformation"—the process of replacing outdated legacy computer systems with custom-built applications, migrating internal databases to remote cloud servers, and leveraging human-assisted artificial intelligence ("AI") tools to automate business operations. To execute such technical transformation projects, Globant structures its workforce into specialized groups called "Studios," and assigns dedicated, cross-functional teams of engineers and designers called "Pods" to work directly on individual client accounts.

3. During the Class Period, Globant generated a substantial portion (approximately 70%) of its revenue by selling the services of its technology engineers, designers, and project managers to corporate clients. Globant billed most of this work to clients under time-and-material contracts, which charged hourly rates for technical services that Globant's employees provided. Accordingly, the Company's financial performance fundamentally turned on two main variables: how many of its employees (approximately 70% of whom were based in Latin America) were assigned billable client work, and the rates at which the Company charged for that work.

4. In mid-2023, Globant announced that it would invest $1 billion to expand its business in Latin America, which former Chief Business Officer Ignacio Iglesias described as "a key market for our company." The centerpiece of that expansion plan was Globant's December 2023 acquisition of Iteris—a Brazilian digital consultancy with more than 600 employees that, like Globant, also specialized in digital transformation. Defendant Migoya told investors the acquisition represented "a doubling down on our commitment to Latin America's largest economy." Thereafter, Globant's expanded Latin American presence became an increasingly important focus of Defendants' narrative about their ability to successfully grow Globant's business. As such, investors viewed both Globant's Latin American operations (whose workforce

supported Globant's businesses worldwide) and the growth of its Latin American client base as material, as reflected by market analysts' repeated questioning of Defendants on these subjects on earnings calls and at conferences over the Class Period.

5. Defendants repeatedly touted the success of their predominantly Latin American operations, and in particular the strength of the demand for Globant services, the growth of its total headcount, and the success of its growth-by-acquisition efforts. These statements were materially false and/or misleading. In truth, and unbeknownst to investors, throughout the Class Period the demand for Globant's services was deteriorating because of Globant's failure to match the lower pricing of its Latin American competitors, and its failure to successfully integrate major acquisitions—like Iteris. Due to these issues, among others, Globant's largest clients began taking their business elsewhere. The loss of business—which began in the middle of 2023, just months before Defendants told investors that demand for its services was "very strong"—accelerated quickly. As one of Globant's former employees ("FEs"), FE-5, stated, *"most of Globant's global accounts experienced some degree of project cancellation, demand reduction, or contract downsizing between 2024 and 2025."* (emphasis added). None of this was lost on Company executives. From the outset, they were aware of these problems. At all-hands and company-wide meetings in 2024 and 2025, executive management, including Defendant Migoya, "never shied away" from discussing the Company's declining client demand, which was "no secret" internally. But Defendants were not as candid with investors as they were with their fellow insiders. As FE-5 put it, publicly, on earnings calls "they were not telling the market" about the Company's declining client demand.

6. To help obscure the decline in demand, Defendants misleadingly touted their increasing headcount, while failing to disclose that it was over-hiring employees to boost their

reported headcount numbers. As a result, workers on the payroll who were not actively staffed to projects were placed on an ever-growing "bench" of idle employees known as the "Dojo" (or Talent Pool), rather than being laid off, which would have raised red flags with investors regarding the actual strength of demand for Globant's services. Indeed, by the first quarter of 2025, Globant's business had deteriorated to such an extent that the Company was forced to design plans for a systemic reduction-in-force as part of a $47 million restructuring plan. Yet, in May 2025 Defendants denied that any such plans were even in the works.

7. As the deteriorating demand for Globant's services became apparent internally within the Company, a mass of Globant executives headed for the exits. At least 17 executives, including Defendant Pomies, left the Company during the Class Period. And during the Class Period, insiders liquidated at least $33 million in stock at prices artificially inflated by Defendants' fraud.

8. The truth gradually began to emerge on February 20, 2025, when Globant reported that its Latin American revenue had declined 1.3% year-over-year in the fourth quarter of 2024 and also issued 2025 revenue guidance that fell short of analysts' expectations. However, this disclosure was only partial, as Defendants continued to conceal the full nature and extent of the deterioration in the Company's demand, as well as the exacerbating problems caused by its failure to integrate the businesses it had acquired. In response to this partial disclosure, the price of Globant common stock fell approximately 28% from $210.17 on February 20, 2025 to close at $151.72 on February 21, 2025.

9. On May 15, 2025, Defendants hosted Globant's first quarter fiscal year 2025 earnings call during which they disclosed that Globant's Latin American revenue had declined by 9% year over year, with "notable contractions in Mexico and Brazil," and cut Globant's full-year

revenue guidance by *$200 million,* reducing the low end of its estimate from $2.64 billion to just $2.46 billion. On this news, Globant common stock fell more than 23% from $132.84 on May 15, 2025 to $101.47 on May 16, 2025. Defendants nevertheless continued to conceal the full truth—instead, Defendant Migoya stated—in direct response to an analyst's question about what the Company was doing to "re-energize growth" in Latin America and whether the Company had "seen some of [its] work get canceled"—that "recovery in Latin America, *it's already happening*," and affirmatively denied, in direct response to a different analyst's question about whether Globant is "undertaking or anticipate undertaking any specific restructuring efforts in any of the global geographies you operate in," that the Company was planning any restructuring.

10. Finally, on August 14, 2025, Defendants disclosed that Globant was (1) reducing its workforce by approximately 1,000 employees and taking a $47.6 million charge "primarily related to workforce resizing and office reductions," and (2) cutting full-year revenue guidance by another $19 million, from a base of $2.46 billion to a base of only $2.45 billion. On the earnings call held the following day, Defendant Urthiague admitted that Defendants knew that Globant's business in Brazil and Mexico had been suffering as early as late 2024, stating, "the deterioration that we saw, for example, in Brazil and Mexico *earlier this year or late last year*." On this news, which finally revealed the full extent of the deterioration in the Company's Latin American business, Globant common stock fell an additional 15% from $78.12 on August 14, 2025 to close at $66.46 on August 15, 2025.

11. Globant's stock price has never recovered and trades at roughly $40 per share as of the filing of this complaint, nearly 82% off its Class Period highs. By this action, Lead Plaintiffs seek to recover, on behalf of themselves and the other members of the proposed Class, for the

substantial losses suffered as a result of Defendants' violations of §10(b) and §20(a) of the Exchange Act.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District. In addition, Globant is listed and traded on the New York Stock Exchange ("NYSE"), which is based in this District. The Company also maintains at least one office in this District at 251 Park Avenue, New York, New York.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

16. Lead Plaintiff Ohio Public Employees Retirement System ("OPERS") provides pension benefits and health care coverage to retired public employees in Ohio. As set forth in its certification (Dkt. No. 36-2), OPERS purchased Globant securities at artificially inflated prices

during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

17. Lead Plaintiff State Teachers Retirement System of Ohio ("Ohio Teachers") is a public pension fund headquartered in Columbus, Ohio, serving approximately 554,000 active, inactive, and retired public educators, school administrators, and higher education faculty across Ohio. As set forth in its certification (Dkt. No. 36-3), Ohio Teachers purchased Globant securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

18. Lead Plaintiff The Office of the Treasurer as Trustee for the State of Connecticut Retirement Plans and Trust Funds ("CRPTF") is responsible for managing the invested assets for approximately 240,000 state and municipal employees, teachers, retirees, and survivorships who are pension plan participants and beneficiaries as well as for trust funds that support academic programs, grants, and initiatives throughout Connecticut. As set forth in its certification (Dkt. No. 36-4), CRPTF purchased Globant securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

**B. Defendants**

19. Defendant Globant is a Société Anonyme (public limited company) organized under the laws of Luxembourg, with its principal executive offices located at 37A, Avenue JF Kennedy, L-1855, Luxembourg. The Company's common stock is listed and trades on the NYSE under the ticker symbol "GLOB."

20. Defendant Migoya has served as Globant's Chief Executive Officer ("CEO") and Co-Founder since he co-founded the Company in 2003.

21. Defendant Urthiague has served as Globant's Chief Financial Officer ("CFO") since 2018.

22. Defendant Pomies served as Globant's Chief Operating Officer ("COO") from 2019 to July 2025.

23. Defendants Migoya, Urthiague, and Pomies are referred to herein collectively as the "Individual Defendants."

24. Globant, together with the Individual Defendants, is referred to herein as the "Defendants."

25. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Globant's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, but not to the public, each Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that their statements at issue here were materially false and/or misleading when made. The Individual Defendants are liable for the materially false and/or misleading statements pleaded herein, as those statements were each the result of the collective actions of the Individual Defendants. Each Individual Defendant is also liable for the statements they personally made, as identified by speaker and date herein, and Globant is also liable as the maker of each statement contained in its press releases, shareholder letters, and SEC filings. Each Individual Defendant had ultimate authority over the content and communication of the statements attributed to them.

26. Globant is liable for the acts of the Individual Defendants and its employees (including all statements made by them) under the doctrine of respondeat superior and common law principles of agency, as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

27. The scienter of the Individual Defendants, and other employees and agents of the Company is similarly imputed to Globant under respondeat superior and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Overview of Globant's Business Model

#### 1. The Company

28. Globant is a technology services company that was co-founded in Argentina in 2003 by Defendant Migoya (CEO).

29. That same year, the Company opened its first offices and headquarters in Buenos Aires, Argentina. As Defendant Migoya put it, "Globant was founded with the dream of leading the technology industry from Latin America."

30. Since its founding, Globant has expanded internationally and throughout Latin America. In 2012, it re-incorporated in Luxembourg and went public in the U.S. on July 18, 2014. Globant trades on the NYSE under the ticker symbol "GLOB."

31. Globant generates revenue by providing technology services and solutions to help businesses with "digital transformation," the process of modernizing an organization's digital technology. Digital transformation can include custom-building applications, migrating internal databases to remote cloud servers, and leveraging AI tools to automate business operations.

32. To execute a digital transformation project, Globant divides its workforce into "Studios," or specialized groups of employees that focus on specific technologies, trends, or industries. During the Class Period, Globant's revenue was derived primarily from its (i) GUT

Studios, which provide customers with marketing technologies, and which accounted for 10% of its revenues and (ii) Enterprise Studios, which provide customers with end-to-end business process transformation services. More recently, Globant has also developed Studios that incorporate AI tools into various types of business transformations.

33. In addition to its GUT and Enterprise Studios, Globant assigned its employees to "Pods," or cross-disciplinary business and tech teams. Pods were intended to put employees at the center of the organization and to foster communications between internal and client teams. Globant typically had several different Pods working on one or more projects for each customer.

34. Once a client hires Globant for a project, Globant enters into a professional services agreement with the client, the majority of which were time-and-materials contracts. Under these contracts, Globant charged clients for services at hourly rates determined by: (i) the complexity of the project; (ii) anticipated staffing needs; (iii) internal forecasts of operating costs; and (iv) expectation of future cost increases.

35. To a lesser extent, Globant enters into fixed-price contracts. Regardless of the type of contract the Company entered into with clients, Globant's revenue was heavily dependent on the number of employees needed for a given project (and the hours such employees could then bill).

**2. Globant's Labor Arbitrage Strategy**

36. During the Class Period, approximately 60% of Globant's revenue was earned "in" North America (i.e., from North American clients), 22% in Latin America, and 17% in Europe. Although its clients are spread across the world, Globant's expansion was largely driven by its Latin American workforce, which accounted for approximately 70% of the Company's employees. This is because labor is significantly cheaper in Latin America than in North America or Europe. That the majority of its workforce was based in Latin America where wages are far cheaper than

in other regions was critical to Globant's growth. In particular, Globant was able to pay its Latin American employees lower wages than in other regions, and paid their salaries, at least in part, in local currencies, which also helped reduced costs. Globant leveraged its cheaper Latin American labor force to provide services for clients located abroad.

37. By the end of 2022, however, inflation in Latin America significantly worsened. Mexico ended 2022 with 7.82% annual inflation—its highest rate in over two decades. In Argentina, yearly inflation had hit 94.8% and was expected to rise further in 2023. And because wages in Argentina were nearly 20% behind the yearly inflation rate, the purchasing power of Argentine workers was severely weakened.

38. As costs in the region continued to rise, Globant froze employee salaries in Latin America in 2023, to try to maintain its competitive contract prices. And because the cost of living increased while employee salaries remained stagnant, Globant employees' salaries were not worth as much as they once were.

### 3. Globant's Latin America Investment and Iteris Acquisition

39. On August 10, 2023, Globant announced a five-year, $1 billion expansion investment in Latin America. As Defendant Migoya explained: "We were born in Latin America and believe that it is one of the strongest regions when it comes to innovation, talent, and creativity." Globant's former Chief Business Officer, Ignacio Iglesias, echoed this, saying, "Latin America is a key market for our company, and we want to strengthen our regional operation."

40. The centerpiece of Globant's pivot to Latin America was its December 2023 acquisition of Iteris—a Brazilian digital consulting company with 600+ employees and 14 years of experience operating in the region. Prior to Globant's acquisition of Iteris, Iteris operated across several industries, including manufacturing, education, retail, and healthcare, and served some of the strongest brands in Brazil.

41. Following the merger, Globant inherited Iteris's employees and its largest Brazilian clients. And, because Iteris was already a well-established Brazilian company, the acquisition was initially viewed as highly beneficial for Globant.

42. Globant also acquired two other companies in 2023. In January 2023, Globant acquired VERTIC, a consultancy company that focused on life-sciences. And in November 2023, Globant acquired a majority stake in GUT—a creative agency with over 60 clients and offices around the world, including in São Paulo, Brazil, Buenos Aires, Argentina, and Mexico City, Mexico.

43. These acquisitions were designed to allow Globant to quickly increase its market value by taking over the existing product lines, client bases, and technologies of other companies. However, these acquisitions posed difficulties for Globant as it had to integrate dozens of new clients and hundreds of new employees into its existing business, which, unbeknownst to investors, it had considerable trouble doing.

44. Throughout the Class Period, Defendants repeatedly touted the strength of demand for Globant's services in Latin America, describing demand in the region as, for example, "very, very high" and representing that Globant was "very strong in LatAm," and highlighting Globant's purported success in building up its Latin American workforce.

45. For example, on the first day of the Class Period on February 15, 2024, Defendant Migoya boasted that Globant's "prominence in Latin America" was "particularly beneficial right now." Defendant Migoya touted the Iteris acquisition, describing it as "a doubling down on [Globant's] commitment to Latin America's largest economy." During the May 16, 2024 conference call, Defendant Pomies described Globant's integration model as providing "a seamless and streamlined experience for companies joining [Globant's] family through M&A."

46. In August 2024, Defendants continued to highlight the strength of Globant's Latin America operations, with Defendant Urthiague stating that the region was "showing good growth," and Defendant Pomies stressing that Globant was "very strong in LatAm as [it has] been in the last couple of years." Similarly, on its Q3 2024 earnings conference call held on November 14, 2024, Defendant Pomies, in discussing Globant's Latin American operations, represented that Globant was "growing year-over-year now."

47. Although Defendants began to tone down their positive statements concerning the state of Globant's Latin American business and operations in 2025, they continued to affirmatively misrepresent that the pipeline was healthy, denying that the Company was even contemplating a possible reduction-in-force restructuring.

**B. Unbeknownst to Investors, Globant's Latin American Business Operations Were Suffering from Deteriorating Demand and Serious Integration Problems**

48. During the Class Period, however, Globant was experiencing significant undisclosed problems, as confirmed by the accounts of numerous former Globant employees. Most significantly, these undisclosed problems included a deterioration in demand and Globant's poorly implemented attempts to integrate Iteris (the much-touted centerpiece of its Latin American expansion strategy), which cost the Company both clients and skilled employees.

**1. Numerous FEs Confirm Globant Latin America's Weakening Demand**

49. Numerous FEs confirm demand for the services of Globant's Latin American workforce began to weaken in the middle of 2023, as clients reduced orders, declined to renew their contracts with Globant, and canceled their engagements outright, and that demand continued to deteriorate over the course of the Class Period. For example:

50. FE-12, Globant's Global Talent Acquisition Leader based in New York from April 2019 to December 2024, primarily managed teams in the United States, Canada, and Middle East,

and reported to Globant's Global Recruiting Director and its Chief Capacity Officer. FE-12 hired stakeholder leaders and personnel for senior roles, helped train, organize, and manage teams in partnership with the Company's C-Suite, was especially involved in building Globant's U.S. market, and hired "everybody billable and non-billable in the U.S.; sales and leadership." FE-12 also worked in partnership with Globant's talent team in Latin America and participated in "global weekly calls with talent acquisition, to get a good sense of what was happening in the Company" with respect to hiring.

51. FE-12 stated that Globant grew from 18,000 to 28,000 employees in a four-year span during her tenure, but that it was hiring "non-billable staff" and "over-hired." According to FE-12, management was ostensibly hiring to "prepare for pipeline or another project coming in," which did not make sense to her because she saw demand for Globant's services declining in Latin America and other regions. As FE-12 stated, "if you're hiring this much and they're not billable it's costing you. It's a net loss." FE-12 stated that Globant did not have the spend to keep up with its hiring practices, that she spoke frequently about these problems with senior business and sales leaders, and that Globant's services were "pretty expensive, they want to do things at 40% margin."

52. FE-12 further stated that Globant created artificial demand for projects in order to justify its hiring practices, explaining that "of the demand that gets created, around 40% of demand created gets cancelled," that "they're just creating demand out of the blue," and that "they created roles for the hell of it to show the market they were growing."

53. FE-12 also described the loss of business from significant clients. According to FE-12, Globant's contract with Disney, one of its largest clients,[1] had declined significantly by the time she left, a decline she attributed to "high spending and a lot of turnover, with new senior

[1] Disney accounted for approximately 8-10% of Globant's revenues during the Class Period.

management coming in." FE-12 also recalled that Globant was "kicked off the project" for JM Family Enterprises, a Florida-based client, because the "key people growing and managing the account left the Company" and because the client was not happy with the quality of the work. FE-12 stated that Globant "definitely lost market share" during her tenure.

54. FE-5 joined Globant's Business Hacking team based in Buenos Aires (where Globant was headquartered) in late 2020, where she was promoted to Business Hacking Manager in September 2024, a position she held until she left the Company after the end of the Class Period—this group functioned similarly to a strategy consulting practice, serving clients Ford, Nissan, Formula One, and 24H Le Mans, and assisted with internal sales and global business development efforts. FE-5 operated alongside a "triad" consisting of a technical director, a delivery director, and a client partner, which reported key information such as revenue, growth, and profit margins to regional commercial leaders, who in turn reported to Globant's top-level executives, including the C-Suite. FE-5 had exposure to the second and third tiers of Globant's leadership, saw C-Suite leaders including Defendant Migoya at social functions, and throughout her tenure consistently attended all-hands and Company-wide meetings at which Defendant Migoya and other C-Suite executives, including Defendant Pomies, spoke.

55. FE-5 stated that Globant maintained approximately 12 global accounts, representing its 12 most important clients worldwide—including Nissan, JPMorgan Chase, Morgan Stanley, Google, and Disney. FE-5 stated that by 2025, Globant was operating in "full-on crisis mode," and that signs of deterioration had been present for several years beforehand. FE-5 had first-hand awareness of this situation in Argentina and knew through conversations with her peers that similar conditions were being experienced in Mexico, Colombia, and Spain. FE-5 stated that the overall trend among clients generally (including its "global accounts" and her own

accounts) was declining demand, with contracts either terminated or significantly reduced in scope. FE-5 confirmed that most of Globant's global accounts experienced some degree of project cancellation, demand reduction, or contract downsizing between 2024 and 2025, and FE-5 had first-hand knowledge of weakening demand from her own clients. She learned about the deterioration in other global accounts through conversations with her peers.

56. FE-5 stated that the Company's global accounts "really moved the needle for Globant," and recalled that cancellations and issues with these accounts were always used to justify negative news that affected employees. For example, FE-5 recounted that at one point halfway through 2025, leadership told her that they would be unable to afford the expense of flying her into the United States for a presentation because "[they] are still managing the loss of Disney." FE-5 also stated that Defendant Migoya emphasized profitability, and that contracts generating margins below approximately 40% to 50% were generally viewed as poor business because they did not meet Globant's financial targets. Drawing on her experience with the Nissan account, FE-5 stated that Globant expected major clients like Nissan to grow by 30% annually while also maintaining profit margins above 40%—expectations she described as "lunacy," because meaningful growth sometimes required accepting lower margins in the short term. Instead, account teams were expected to achieve both aggressive growth and high profitability simultaneously, which FE-5 described as a constant challenge requiring "financial gymnastics" to achieve.

57. FE-5 stated that it was widely understood within Globant that the Company's revenue was directly tied to headcount, and that declining employee headcount was viewed as an indicator that overall business growth had or would slow or flatten, because of the close relationship between headcount and revenue. FE-5 stated that increases in overall employee headcount in 2024 and 2025 were often driven by acquisitions (where Globant effectively acquired

the employees of companies it bought) rather than by organic business growth such that increases in staffing levels resulting from acquisitions were not indicative of increased client demand.

58. FE-5 stated that at all-hands and Company-wide meetings in 2024 and 2025, executive management, including Defendant Migoya himself, "never shied away" from discussing the Company's declining client demand: "internally, these were topics that were in the conversation for a long time, maybe [the executives] explanations for the declines weren't fully satisfactory, but [declines] were discussed, [internally] it was no secret." Publicly, however, on earnings calls, Defendants "sh[ied] away" from these issues; as FE-5 put it, "*they were not telling the market*."

59. FE-13, a Google Project Manager in Globant's Mexico City office from October 2021 to July 2025, managed billing, business proposals, and other project needs for Globant's Google account. FE-13 stated that Globant lost projects and work with Google during her tenure. According to FE-13, Google first began to cut back on its projects with Globant around two years before she left the Company—in or around mid-2023—when Globant "lost a huge project with Google" and 80 people were let go. FE-13 recalled being told that Google was taking its business to other firms for lower prices, and that other Globant clients were decreasing their contracts and projects.

60. FE-3 was a Software Architect in Globant's Mexico City office from August 2018 to May 2024, having begun as a software developer and been promoted twice. FE-3 designed systems and solutions for clients, managed IT staff, and trained employees, working on projects for two U.S. clients, Express and Lending Club, and reporting directly to Lending Club's engineering manager. FE-3 stated that Express eventually ended its contract with Globant. FE-3 stated that Lending Club was one of Globant's biggest accounts, with approximately 100 people

staffed on the account. According to FE-3, Lending Club ultimately cancelled its contract with Globant, primarily (according to her discussions with Lending Club's engineering manager) due to Globant's decision to increase its cost of services.

61. FE-3 also recalled that Disney—one of Globant's largest clients during the Class Period—cut projects with Globant. FE-3 stated that issues with the Disney account began near the end of 2023, and that Disney shifted some work to another company in Mexico due to cost concerns. FE-3 added that another client, Autodesk, likewise reduced its projects with Globant, again citing Globant's increased rates. FE-3 further observed that by 2023, Globant's price increases were "unsustainable," and identified Wizeline as the main competitor that Globant was losing business to in Mexico. FE-3 also recounted that Capital One was reducing its projects and cutting staff with Globant in 2024.

62. FE-1, a Business Hacking Manager based in Globant's Mexico City office from fall 2024 to mid-2025, helped to connect customers' objectives with Globant's technology, supported Globant's business development efforts and was directly responsible for a team of four employees (with 12 total business analysts beneath her). FE-1 reported to Juan Carlos Aquique, a Business Hacking Director based in Argentina. FE-1 worked predominantly with clients in the automotive industry in Mexico, including Nissan and Mazda. According to FE-1, in late 2024, Mazda put a hold on the second phase of a project with Globant, and that in February 2025, Nissan advised Globant that, after it finished its current project with Globant, it "would not contract with Globant any more." During FE-1's time on the Nissan project, Globant was building out a database and language model using historical sales data that it had promised Nissan would generate new customers. FE-1 stated that Nissan was disappointed with the results, as it had expected greater sales, and that the project "was not that successful based on numbers." FE-1 added that Nissan

was "not happy with the results of the project or how the project was progressing" and "complained about the efficiency of the results."

63. Further, FE-1 stated that Globant began to see the largest impact of clients scaling back and/or cancelling projects in December 2024 and January 2025. FE-1 also explained that Globant was expensive, illustrating with a hypothetical: "if the cost of people is $5 an hour, [Globant] charges the customer 3x the cost." FE-1 further explained that Globant charged more than its competitors: "we are charging $230,000 for 3 months [of a project] and our competitor is charging 50k below for the same thing." According to FE-1, "Globant was operating like a big company, but they were working like a start up and they had a lot of inexperienced employees." FE-1 further stated that even though Globant's business was "dropping," the Company was "hiring people and putting people on the bench, so there were so many questions internally," and that a lot of people did not have projects assigned, especially within technology teams.

64. FE-20 was a Service Delivery Manager based in Peru from February 2023 to July 2025 (and, before that, an IT Support & Delivery/IT Project Manager beginning in November 2020), who supervised team members in India, Uruguay, and Argentina that served primarily U.S. clients. From late 2023 until February or March 2024, FE-20 was the Service Delivery Manager on the Royal Caribbean Cruises ("Royal Caribbean") account, managing a team of 16 employees and reporting to Royal Caribbean's Vice President of technology. FE-20 stated that Royal Caribbean had told her that it wanted to leave Globant and hire a competitor.

65. FE-2, a Project Delivery Manager in Globant's Mexico City office from December 2020 to March 2026, oversaw project execution and delivery, and worked with clients including Royal Caribbean and Nasdaq. The Royal Caribbean account was FE-2's last project. According to FE-2, in mid-2025, Royal Caribbean informed Globant that it would not renew its contract at

the same level because Globant's rates were too high, and the project was too expensive to maintain. As a result, FE-2 stated that staffing on the account was significantly reduced. FE-2 estimated that there were more than 200 people working on the Royal Caribbean project, and that at least 60 employees were removed from the project following the client's decision.

66. FE-4 was a Senior Front-End Developer in Globant's Mexico City office from February 2017 until 2025. In this role, FE-4 developed software and reviewed the work of other developers for U.S.-based clients in the financial services, aviation, and e-commerce industries, and reported internally to a tech director, who reported to leadership in Mexico, Argentina, and the US. As FE-4 stated, many Globant clients began cancelling projects in 2024; while 2023 was relatively stable, by 2024 numerous projects came to an end and clients chose not to renew their contracts. As a result, many employees were left waiting for new assignments, and a large number were placed in Globant's internal bench for employees not assigned to a client project, known as the "Dojo" (formerly the "Talent Pool"). Even earlier, in November 2023, a Deloitte project on which FE-4 worked was cancelled after six to seven months.

67. FE-6, a Senior Marketing Lead in Globant's Mexico City office from 2021 to mid-2025, performed data analytics work for the marketing team. FE-6 reported to a Data Analytics Manager, who reported to a Marketing Director who, according to FE-6, reported directly to top-level management. The data analytics team included 50 people across Latin America and, beginning in January 2025, participated in meetings once every two weeks where current and expected staffing needs for incoming projects were discussed. These biweekly meetings were led by a staffing team lead. FE-6 stated that Globant used Salesforce as a CRM (customer relationship management) system, which allowed users to see incoming "tickets" for projects in the pipeline, and showed the client's name, the number, and types of Globant staff ("roles") needed, and other

relevant information for the project. FE-6 accessed this information through an Excel spreadsheet that was automatically filled with information from Salesforce tickets. According to FE-6, anyone at the manager or director level, as well as various members of the staffing team, SEO (search engine optimization) team, and data analytics team, had access either to Salesforce or to the Excel spreadsheet with Salesforce information. FE-6 recalled that starting in around January 2025, as the weeks went by, she observed how, through her attendance at biweekly staffing meetings, she saw projects decreasing and cancelling, that the number of roles on potential projects would "go from [ten] to five to three" before, in many cases, being cancelled—and that these involved both new and existing clients.

68. According to FE-6, a significant portion of the client ticket cancellations she observed involved U.S. clients, and of the 10 to 12 projects she would see populate her spreadsheet, approximately four to five would be reduced or cancelled per month—a mix of small projects (requiring one to three employees) and larger projects requiring a "whole team" of at least seven people. FE-6 added that "everyone above [her] was also aware of project cancellations."

69. FE-6 also observed a significant change in project availability during her time at Globant. When she joined the Company in 2021, her manager told her that she could afford to be selective and decline project assignments she was not interested in, because there were numerous project opportunities available. However, as her responsibilities increased, FE-6 gained greater visibility into incoming projects and staffing needs, and during the final year of her tenure she began to realize that it was not wise to advise employees to decline project opportunities because available work had become much more limited. FE-6 advised employees to remain on their existing projects whenever possible, because securing a new assignment was no longer guaranteed. According to FE-6, ending up in the Dojo carried greater risk than it had in prior years, as

employees could no longer assume that they would quickly be reassigned to a new project, or even assigned to a project at all. FE-6 observed this decline in project availability through her access to information in Salesforce while she was staffed on a long-term project.

70. The deterioration in Globant's demand was also observed by FEs based in the United States. For example:

(a) FE-15, a Product Experience Director based in Alpharetta, Georgia from 2022 through the end of the Class Period, worked directly with clients prior to and during the Class Period to develop software tools, and assisted with proposal development and pre-sales efforts. FE-15 stated that despite Globant's image of being profitable and constantly growing, internal teams were consistently pressured to generate more revenue but failed to do so.

(b) Similarly, FE-17, a Managing Director based in Englewood, Colorado from January 2023 to August 2025 who oversaw $175 million in business with customers in the United States and Australia, joined Globant through its acquisition of Navint. At Navint, FE-17 had been Executive Vice President of Sales, managed existing clients and pursued new ones, oversaw a $175 million business primarily with customers in the United States, and was responsible for forecasting and for North American sales of enterprise platforms, including to Oracle and ServiceNow. FE-17 stated that most sales teams were missing their targets.

### 2. The FEs Detailed Accounts of Globant's "Dojo," and Wage and Promotion Freezes to Forestall Layoffs, Evidence Declining Demand for Globant's Services During the Class Period

71. ***The Relegation of Increasing Numbers of Globant Workers to the "Dojo."*** Numerous FEs[2] described how employees were relegated to the "Dojo." Many former employees describe being personally relegated to the Dojo during their employment or observing their

---

[2] *See, e.g.*, FE-7; FE-6; FE-13; FE-11; FE-9; FE-10; FE-19; FE-18; FE-15; FE-2; FE-4; FE-12.

colleagues spend time in the Dojo. FE-7 worked as a Senior Associate within the Business Hacking Studio at Globant from March 2024 to August 2025 in Barcelona, Spain. FE-7 reported to Alvaro De la Mora, who reported to European and Argentine Chief Business Officers as well as the C-Suite. FE-7 stated that, through StarMeUp, an internal social networking platform, employees could see staffing assignments, in particular, who was staffed on particular customer projects—and who was "in the Dojo." FE-18, a Business Hacker based in Madrid, August 2022 to March 2026, also confirmed that accessible information on StarMeUp allowed all Globant employees to determine who was actively assigned to projects versus who was in the Dojo and thus available for staffing. According to FE-9, who worked in Tech Training & Development at Iteris and then Globant, from mid-2022 to early 2025, after Globant acquired Iteris, she identified names of employees that were left in the Dojo "for almost a year."

72. Various FEs described how, for an increasingly large number of Globant employees who were relegated to the Dojo, the Dojo became largely a waystation to the last stop before termination. FE-12 recalled that throughout her tenure (which began in 2019) the number of employees in the Dojo "was increasing" and that Globant "had so many people on the bench," with employees remaining there for three to four months without any work. Similarly, FE-19, who headed Cloud & DevOps Experience at Iteris and served as a Technical Manager at Globant in early 2025, recalled that before leaving Globant, recalled that before leaving Globant in February 2025, the Dojo had become particularly crowded, and it had become common in proposal development meetings to hear sales staff complain that they "ha[d] a lot of people in the Dojo" that the Company "need[ed] to get rid of."

73. FE-3 recounted that Globant was hiring more and more people even though it seemed like the Company was losing business, that Globant was over-hiring, and that there were

not enough projects for people to be staffed on. FE-3 stated that the amount of employees on the bench at Globant increased throughout her tenure, and that she knew someone who spent six months in the Dojo, with no projects, just internal trainings.

74. FE-10 was hired by Iteris in December 2016 as a SharePoint developer and was internally promoted to Sales and Customer Success Manager, heading two different teams within Iteris's CAP Solutions business unit when Globant acquired Iteris and remaining their manager as the acquisition was finalized. She then served as a Sales and Customer Service Manager at Globant in São Paulo, Brazil, from early 2024 to the spring of 2025. In these roles, FE-10 drafted and managed business strategies for new and existing clients, tracked and reported sales data, partnered with engineering teams to improve application viability, and attended weekly meetings with sales teams to track how many clients were in the "pipeline," the status of projects, and whether deals were being closed. FE-10 had a total of 20 people reporting to her across her teams in engineering and sales, which worked across three verticals: customer success, sales, and project onboarding. FE-10 reported to Iteris's Vice President of Services and People.

75. FE-10 stated that a lot of individuals were put in the Dojo during her time at Globant—including senior-level Vice Presidents and Directors, which she found shocking—and that the number of employees on Globant's bench increased a lot during her tenure. FE-10 stated that this pointed to problems, because "they were cutting people from [her] team, people who are working, getting money, getting revenue." FE-10 contrasted Globant's Dojo with Iteris's bench, noting that Iteris "rotated employees out of its Dojo really well," which was not the case at Globant. Indeed, according to FE-10, Globant management had initially used the Dojo during the merger as an "argument for stability" to assuage Iteris employees' fears about their job security, telling them: "Globant has a bench, they never fire people."

76. However, rather than disclose that demand had deteriorated to the point many of Globant's employees had no client work, Defendants delayed and denied implementing wholesale cuts to their under-utilized staff until they belatedly admitted in August 2025 that they had, unbeknownst to investors, begun implementing a wholesale restructuring of its business, including a major reduction of its workforce, earlier in the year.

77. ***Globant's Freezing of Salaries and Promotions in Latin America***. Numerous former employees across Latin America confirm how Globant implemented salary and promotion freezes as early as 2022 in some countries, and that Globant continued to maintain these freezes throughout the Class Period. For instance, FE-5 recalled promotion and salary freezes, beginning in Argentina around 2022, which were only partially lifted "temporarily" during brief periods of improved business performance, and how these remained issues throughout her tenure, and—based on her conversations with friends who are still at the Company—continue to this day. FE-3 recalled how, in October 2023, employees in her area began noticing the lack of raises, and how even previously approved raises and promotions were postponed and eventually cancelled. FE-13 described the lack of any raise from approximately July 2022 through July 2025 and stated that she was told there was "no money" for them and that Globant "can't afford" it. FE-2 recalled regional leadership in Mexico announcing that there would be no salary increases due to financial issues, and that the freeze continued into subsequent years because raising salaries would increase costs and make Globant less competitive. FE-8, a Delivery Manager based in Medellín, Colombia from late 2018 to mid-2025, recalled how Globant stopped giving annual salary increases for inflation and slowed promotions, and that by 2023, salary increases and promotions ceased almost entirely with management citing difficult business circumstances and explaining that freezing salaries was part of a broader effort to prevent layoffs. FE-14, a Senior Client Associate Manager

in Globant's Mexico City office from November 2023 to August 2025, described how Globant's employees in Mexico had not received any increases in pay for numerous years.

78. FE-3 stated that she heard from partners and project managers that there was a "bad situation" at Globant financially due to the Company losing clients and business, and that people she knows at Globant are still waiting for salary raises. FE-3 recounted that offices were closing in the United States and Argentina. FE-1 likewise stated that there were issues with employees requesting raises and promotions and not receiving them.

79. The resulting turnover harmed Globant's client relationships. FE-3 stated that clients complained about issues of retention: according to FE-3, "major people" at Globant were leaving because they were upset with Globant not paying them, and clients were complaining about high turnover on their accounts, as people were taken off projects or left the Company and had to be replaced frequently. FE-3 stated that this impacted projects and delayed tasks, because every time it happened, new people had to be onboarded and trained.

80. However, rather than disclose that demand had deteriorated to the point that Globant was withholding salary increases and promotions for multiple years across Latin America, Defendants falsely touted the alleged "strength" of the demand for their services.

#### 3. Unbeknownst to Investors, Globant Was Also Having Serious Problems Integrating Its Acquisitions, Further Undermining Its Ability to Attract or Retain Customers

81. Former employees also described how Globant's purportedly successful integration of recently acquired companies was plagued by problems that further undermined, rather than strengthened, Globant's operations.

82. FE-19 was the Head of Cloud & DevOps Experience at Iteris, where she worked on the pre-sales side of client engagements, designing technical solutions (and determining the teams needed to implement them) for commercial proposals. FE-19 worked at Iteris under the

Globant umbrella beginning in early 2024 and held the title of Technical Manager at Globant during the first quarter of 2025 (where she reported to a Senior Tech Director, who reported to Globant's Vice President of Technology). FE-19 described how the quality of work Globant provided was significantly inferior compared to the work Iteris provided.

83. FE-19 also recalled her frustration at being unable to secure pay raises for employees who had reported to her at Iteris, even though they were due for a salary increase. FE-19, in response to repeated requests to Human Resources and other senior leaders at Globant to clarify the process for implementing salary raises, stated that she never received satisfactory answers, and was told instead that employees had "to wait for the integration to be over"—and that until Globant finished "mapping Iteris roles into new positions at Globant" the Company was "freez[ing] all movement of salaries and promotions." Ultimately, none of the employees in FE-19's group received raises, and she left Globant upon realizing that the Company was not going to give out merited promotions or raises.

84. FE-10 stated that starting in mid-2024, her business unit was "slowly being dismantled," even though it generated R$10,000,000 (Brazilian reais) in annual recurring revenue and had a portfolio of 30 clients, based across several countries and regions including Colombia, Chile, Germany, Spain, and North America—among the largest of which were Albert Einstein Hospital, Votorantim Cimentos, and SGS. FE-10 stated that her partner managers and fellow legacy Iteris employees were let go before she was also fired.

85. FE-10 stated that she had full autonomy to manage clients at Iteris but lost it once Globant completed the acquisition; that for the first six months after the acquisition, management gave her no information about Company operations despite her managerial role; and that she was slowly shut out of the weekly meetings with Globant employees in which she had previously

participated. As FE-10 put it, "time after time, month after month, they were dismissing people," in waves of firings that culminated in April 2025, when Globant dismissed all of the sales operation and customer success teams under her purview, including FE-10 herself.

86. FE-10 further stated that, when she worked for Globant, former Iteris clients complained about the change in service prices, and that "Globant was very expensive" compared to its competitors. According to FE-10, Globant was not able to manage well the client relationships it absorbed from Iteris's CAP business unit; appointing staff at Globant was a complex and hierarchical process, whereas Iteris's process had been simple and streamlined; and Globant lost clients throughout 2024 and 2025 because of its prices. As FE-10 explained, her "biggest problem was competing in the market with the expensive price. It's not just the pipeline; they had target of 40% margins"—a target she described as "crazy," because "if your goal is to expand, you can't expand with that." According to FE-10, she was not given authority to negotiate, was not allowed to reduce the margins on her projects and was "asked to do more with less people," which made it incredibly difficult to acquire new clients: in six months, she was able to acquire only two new clients under the Globant umbrella, Lactalis and Veolia, both of which came directly from Iteris marketing leads. FE-10 also heard from other former Iteris sales staff who were struggling with the same problem, and who told her that "it was getting worse and worse" and that more clients were complaining about the pricing.

87. FE-10 also described how many Iteris and Globant teams were merged in a thoroughly disorganized manner. For example, according to FE-10, Salesforce and SAP teams were merged into one, leaving displaced managers who had client relationships scrambling to find and join any new team that they could. According to FE-10, Globant had not even established any goal for the merger and provided no direction as to how they expected the integration process to

work. FE-10 stated that Iteris had been acquired for its digital development teams and capacity, with the understanding that those teams would work separately from Globant's established teams such as Salesforce and SAP. Instead, however, according to FE-10, Iteris employees were slowly absorbed into other Globant teams, such that Globant "was absorbing verticals but not using any knowledge from Iteris [employees]." FE-10 stated that similar integration problems occurred with Globant's other acquired companies. In sum, as FE-10 stated, she could "never describe the process as a merge. It was more of a fight, who gets to keep their job and who gets cut."

88. FE-10 also explained that Iteris employees had been set up under an "earnout agreement," under which managers and employees had targets to reach in order to receive profit-sharing benefits. According to FE-10, managers "worked hard to achieve these numbers," and Iteris management, especially Iteris Co-CEO Fernando Riva, "always had a presentation with numbers, how close we were, how to reach the goals." After the acquisition, however, at the end of 2024, Globant management stopped sharing this information, reasoning that "[staff] couldn't achieve these numbers," and Globant put an end to the profit-sharing benefits—which caused a "really bad feeling" among employees and caused a lot of Iteris staff to leave. Although FE-10 did not know who made the final decision to end profit-sharing, it was communicated by Carlos Morais, who took over Riva's former position.

89. FE-11 was a Project Manager in São Paulo, Brazil from mid–2023 to mid–2025, first at Iteris and then at Globant after the merger. FE-11 onboarded clients and managed projects, led daily technical meetings, revised project documentation, drafted and sent weekly and monthly reports, and reported to Leonardo Ibelli, a project manager who had joined Globant from Iteris. FE-11 recounted that initially she had been pretty hopeful at the news about the merger. However, FE-11 stated that cost of services charged by Globant was a lot more expensive than what Iteris

had charged its clients, and that as a result, the merged entity "lost a lot of clients" during the integration process.

90. FE-9, who joined Iteris in 2022, stated that after the acquisition, "the quality of work declined considerably," citing a "[l]ack of organization [and] lack of transparency. It became harder for people to do their jobs well."

91. Iteris was not Globant's only problematic acquisition. As FE-12 stated, Globant acquired companies to "take their revenue generation and add it to the books." FE-12 identified Experience IT, a Minnesota-based consulting firm, as an example of a company that was acquired but "never integrated into Globant," and stated that "all of the M&A founders who were brought into Globant left" and that for "every four, one would get integrated and the other three would just be useless."

92. FE-12 added that Globant "would have a bad acquisition every two or three months, and they would be completely siloed out." According to FE-12, management would announce acquisitions in Company-wide emails without sharing any purpose or goal for them. And, when FE-12 asked senior Globant management about the acquired companies, they did not know what the goals or purposes were either: "I talk to all the leaders, ask them, 'what does this company do,' [and] they say, 'no idea.'" FE-12 also confirmed that "there was pretty much no integration of companies." Instead, the acquisitions appeared to be made solely to allow Globant "to tack on another $20 million, $40 million [in revenue] on the books," and that "when you do an M&A the price goes up, marketing gets better," and deals were done, "it was more for image, because they were excellent marketers." As FE-12 summed it up, Globant's acquisitions were basically "all smoke and mirrors"–which Globant was doing for show rather than for good business.

93. FE-7 offered the same assessment from Europe. FE-7 stated that Globant often failed to adequately update its own internal processes and protocols following acquisitions, such that collaboration across teams became increasingly difficult and integration and onboarding efforts were insufficient. FE-7 recalled in particular that acquisitions in Spain that occurred during her tenure contributed to organizational disruption. FE-7 described the period as chaotic because Globant was simultaneously managing major projects while also integrating newly acquired companies in Spain.

94. FE-5 likewise described Globant's acquisition strategy as a "mess." FE-5 recounted that there was an excess of acquisitions and hiring at Globant during her tenure, explaining that "seeing salaries be frozen along with the acquisition of dozens of companies, it felt like nonsense, like disrespect." FE-5 stated that these acquisition decisions were made to offset Globant's lack of growth, describing Globant's practice of acquiring companies as "inorganic growth"—a tool Globant used to "artificially boost numbers," but that instead just caused "short term confusion," and "didn't change the fact that [Globant's] core business model became obsolete since 2023."

95. According to FE-5, Globant often acquired businesses before developing a clear integration plan, and integration efforts frequently began only after transactions closed, creating significant uncertainty, confusion, and operational inefficiencies. FE-5 stated that acquired companies often maintained different salary structures, job frameworks, and ways of working; cultural integration was largely overlooked; and acquired entities frequently continued operating as separate organizations, sometimes even retaining their own systems and email domains. FE-5 described the process as a "buy first, ask questions later" approach. FE-5 stated that senior leadership was aware of these acquisition and integration challenges, specifically noting that

executives such as Defendant Pomies, Chief Global Brand Officer Wanda Weigert, and other C-Suite leaders "100%" would have had visibility into the acquisition issues. FE-5 added that there was a disconnect between those who approved acquisitions and those responsible for making them successful: senior leadership made acquisition decisions, while operational teams were left to address integration challenges after the fact.

### C. By Early 2025, Globant's Demand Had Deteriorated to the Point that Wholesale Cuts to Globant's Workforce Were Required

96. According to numerous FEs, by early 2025, the decline in customer demand had become sufficiently severe that the Company had begun to implement plans to not simply fire additional workers, but to make employee reductions-in-force on a wholesale level. For instance, as FE-15 recalled, "entire departments were fired."

97. FE-14 confirmed that between March and June 2025, there were internal discussions about the likelihood of layoffs and restructuring and recalled a large layoff of approximately 1,500 people during that time period, mostly developers.

98. FE-16 was a Channel and Alliance Manager based in San Francisco from late 2022 to the spring of 2025, and who joined Globant through its acquisition of Navint (a North American Salesforce consulting company) and focused on Globant's Salesforce business (which included Salesforce's Revenue Cloud and billing partners). She reported to Vice President of Sales Eric Semal, who in turn reported to Diego Maldonado, Globant's CEO of Strategic Partnerships. FE-16 recalled that at the beginning of 2025, there was a large executive on-site meeting, which took place in Miami in or around January 2025. After the meeting, Semal told FE-16 that leadership had informed Semal that cuts would need to be made across all teams and advised her to begin looking for another job.

99. FE-1 stated that she started to hear about restructuring efforts in December 2024 or January 2025. FE-1 heard this from her director, who in turn heard it from a Partner in Argentina who was at the "top of the pyramid" and reported directly to Defendant Migoya and others in the C-Suite. FE-1 was laid off in June 2025 and was told that it was because she was the newest member of her team and as a result of the poor performance of the Company at the time. According to FE-1, the large number of people without assigned projects "may have caused the layoffs."

100. FE-10 recalled that in April 2025, Globant dismissed all of the sales operation and customer success teams under her purview.

101. FE-15 noted that in July 2025, Defendant Pomies stepped down from her position as Chief Operating Officer, based on what was presented as a mutual agreement between her and the Company. However, FE-15 saw the move as proof that Globant was not meeting projections and revenue targets and that Pomies "took the fall" for it. FE-15 also recalled an unexpected wave of executive departures from Globant in late 2024, including the departure of a director whom she did not name, which concerned her because "the guy [was] kind of a major brick in this building."

102. FE-18 recalled that the Company sent an email formally announcing Pomies's departure and thanking her for her years of service, but without explaining the reasons for her exit; similar announcements were made when other executives had left, typically stating only that they were pursuing other opportunities.

**1. The Truth Emerges**

103. The truth regarding Globant's Latin American business gradually emerged through a series of partial disclosures between February and August 2025, more than one year after the demand for its services had begun to decrease. Each disclosure partially revealed some degree of deterioration, and each caused Globant's stock price to fall. But because Defendants continued to conceal the deterioration, and attributed it to conditions outside their control, its February and May

2025 disclosures were only partial, and Globant's stock price remained artificially inflated through the end of the Class Period.

**2. February 20, 2025 Partial Corrective Disclosures**

104. On February 20, 2025, Globant reported its results for the fourth quarter and full year 2024. Globant disclosed that its Latin American revenue had declined 1.3% year over year in the fourth quarter of 2024—the region's first year-over-year decline of the Class Period—and that Latin America's share of Globant's total revenue had fallen to 20.4%, from 23.0% just two quarters earlier. Globant also issued full-year 2025 revenue guidance of $2.635 billion to $2.705 billion, which fell below analysts' expectations.

105. Defendants attributed the Latin American shortfall to external conditions. Defendant Migoya told investors that 2024 in the region had been "a little bit rocky there because of the political turmoil and different things that happened in Brazil and in Colombia, mainly." Defendant Urthiague similarly stated that "the recent volatility in political and macroeconomic conditions is impacting the demand in Latin America, specifically in Mexico and Brazil," and that "there was a lot of political noise in Q4."

106. This disclosure partially revealed that Globant's Latin American business was not the growing, "particularly beneficial" market that Defendants had described. On this news, Globant's stock price fell $58.45 per share, or 28%, from a closing price of $210.17 per share on February 20, 2025, to a closing price of $151.72 per share on February 21, 2025.

107. Analysts reacted to the disclosure. On February 21, 2025, for example, Deutsche Bank reported that Globant's "FY25 revenue guide of ~9.5% organic cc (1Q25 organic growth drops to ~7%)" was below expectations of 11-12% and lowered its FY25 and FY26 earnings-per-share estimates. Deutsche Bank also noted that Latin America ("~20.4% of revenue") "saw revenues contract ~1.3% Y/Y, with part of the decline driven by elevated geopolitical and macro

pressures"—reflecting the market's acceptance of Defendants' attribution of the decline to external conditions.

108. The disclosure was only partial, however, as Defendants continued to conceal the full nature and extent of the deterioration in the Company's demand, as well as the exacerbating problems caused by its failure to integrate the businesses it had acquired. The negative stock price reaction would also have been more severe had Defendants not also misleadingly assured investors that "the situation is a little bit more stable now" in Latin America, and that the region's pipeline looked "a little bit more healthy."

### 3. May 15, 2025 Partial Corrective Disclosures

109. On May 15, 2025, Globant reported its results for the first quarter of 2025. Globant's revenue of $611.1 million fell short of the $618.0 million to $628.0 million range it had guided to in February. Globant disclosed that its Latin American revenue had declined close to 9% year over year, "with notable contractions in Mexico and Brazil," and that Latin America's share of total revenue had fallen further, to 19.6%. Globant also lowered its full-year 2025 revenue guidance from a range of $2.635 billion to $2.705 billion to a decidedly less favorable estimate of "at least $2.464 billion" (i.e., a $170 million reduction to its prior low end figure of $2.635 billion) and lowering its growth estimate from a range of 9.1% to 12.0% to just 2%. Defendant Migoya acknowledged that "growth in some countries in Latin America [was] lower than expected," and stated: "Mexico is suffering. Brazil is suffering."

110. On this news, Globant's stock price fell $31.37 per share, or more than 23%, from a closing price of $132.84 per share on May 15, 2025, to a closing price of $101.47 per share on May 16, 2025.

111. Analysts were stunned. On May 15, 2025, UBS described the quarter as an "[u]nprecedented weak performance," explaining that "Globant's Q1 print was very weak, with

an unprecedented miss vs. guidance and market's estimates (first time in 11 years)." On May 16, 2025, J.P. Morgan likewise wrote that "[a] rare miss and cut from GLOB should trigger a harsh stock reaction," that "the surprise miss can be viewed as a quick reversal of what allowed GLOB to outperform last year," and that "GLOB's premium growth thesis will be tested this year," and lowered its price target to $108.

112. Again, the disclosure was only partial, however, as Defendants continued to conceal the full nature and extent of the deterioration in the Company's demand, as well as the exacerbating problems caused by its failure to integrate the businesses it had acquired. The negative stock price reaction would have been more severe had Defendants not misleadingly assured investors that "recovery in Latin America, it's already happening," and falsely denied that Globant was undertaking (or even planning) any restructuring.

113. Analysts continued to credit Defendants' assurances. On June 26, 2025, for example, Canaccord Genuity reported that "[p]olitical and economic instability in Latin America—particularly in Mexico and Brazil—has pressured client budgets," and that "management maintains that these challenges are largely cyclical, not structural." Canaccord accordingly viewed "Globant's near-term turbulence as a reset, not a reversal," noting that "[m]anagement sees today's challenges as transitory."

**4. The August 14, 2025 Disclosures**

114. On August 14, 2025, Globant reported its results for the second quarter of 2025, revealing further deterioration in its business. Globant disclosed that it had recorded a $47.6 million charge in connection with "the Company's Business Optimization Program initiated in April 2025," which the Company described as "primarily related to workforce resizing and office reductions." Globant's headcount fell during the quarter from 31,102 to 30,084 employees—a net reduction of 1,018 employees in a single quarter. Globant reported an IFRS diluted loss of $0.05

per share, compared to IFRS diluted earnings of $0.87 per share in the second quarter of 2024. And Globant cut its full-year 2025 revenue guidance again, to "at least $2.445 billion" – implying growth of roughly 1% for 2025, compared to the 9.1% to 12.0% growth that Defendants had projected just six months earlier.

115. On the accompanying earnings call, Defendant Urthiague also finally conceded that Latin America had been "going down for a number of quarters," and acknowledged "the deterioration that we saw, for example, in Brazil and Mexico earlier this year or late last year." These admissions confirmed that the region's decline had begun no later than late 2024– when Defendants were assuring investors that Globant was "slightly growing year-over-year now" in Latin America and would "start growing faster."

116. These disclosures belatedly informed the market of the full extent of the deterioration that Defendants had concealed throughout the Class Period.

117. On this news, Globant's stock price fell $11.66 per share, or nearly 15%, from a closing price of $78.12 per share on August 14, 2025, to a closing price of $66.46 per share on August 15, 2025.

118. Analysts reacted negatively. On August 14, 2025, Canaccord Genuity reported that "management trimmed CY25 constant-currency growth guidance to ~1% (from 2%)" and that "[t]he company also executed a ~3% headcount reduction," explaining that "[b]oth actions fueled an additional ~10% after-hours selloff, as they raise fresh concerns about the growth trajectory into CY26," and lowered its price target from $97 to $80. On August 15, 2025, J.P. Morgan downgraded Globant to Neutral, explaining that the revised guidance "implies a lackluster FY25 exit rate of -9% revenue growth" and that "our prior thesis of premium growth and track record

for Globant appears challenged." And Guggenheim described the cut to Globant's revenue outlook as "disappointing," trimming its price target to $85 from $105.

**D. Defendants' Materially False and/or Misleading Statements and Omissions**

119. Throughout the Class Period, in earnings calls and other public statements, Defendants made materially false and/or misleading statements and omitted material facts necessary to make their statements not misleading. As summarized above, Defendants represented that: (a) Latin American demand was strong and growing, when it was deteriorating; (b) Globant was successfully integrating the businesses it acquired, including Iteris, when those acquisitions were not being integrated and were losing clients and employees; and (c) Globant was seeing record-low attrition and continued "positive net additions" of employees, when in fact it was concealing the growing number of employees with no work who were kept in the "Dojo" rather than simply being terminated. In the latter part of the Class Period, Defendants also falsely denied that Globant was undertaking or planning any restructuring, when a restructuring program had already begun.

**1. February 15, 2024 Fourth Quarter 2023 Earnings Call**

120. The Class Period begins on February 15, 2024, when Globant reported its fourth quarter and full year 2023 results and held an earnings call. On that call, Defendants presented Latin America as the Company's principal strategic advantage and the engine of its future growth. Defendant Migoya told investors:

> Our prominence in Latin America, our home region, is particularly beneficial right now as more of the biggest companies choose this region due to its proximity, multilingualism, and adaptability. In the past months, we have made significant investments in Mexico and Brazil, the [two] largest economies and responsible for 38% of Globant's revenue in the region because we are eager to take up this demand. . . . We are optimistic about our future expansion this year as *we see a robust business pipeline and organization's IT expenditures recovering compared to last year*. (emphasis added).

121. In addition, Defendant Urthiague represented that:

> *Our pipeline is strong*, and we see a positive change of tone regarding discussions of our clients' long-term strategies relative to the start of last year. We still have plenty of room to grow with many of our clients. And as we scale, we seek to add more and more companies who wish to have the Globant experience. (emphasis added).

122. Defendant Pomies also represented that Globant's workforce was growing in response to client demand, stating "*we continue to have positive net additions on an organic basis, which is a reflection of the demand we see*." (emphasis added).

123. The statements set forth above at ¶¶120-121 were materially false and/or misleading when made.

124. Contrary to Defendants' statements that the Company's pipeline was "robust" and "strong," Globant was already losing Latin American-serviced business and experiencing weakened demand. For example, beginning in the middle of 2023 and thereafter, several of Globant's largest clients began to cancel or cut back on projects with the Company or shift work to a competitor (*see, e.g.*, ¶¶49, 55, 59, 61, 64, 66). Indeed, when Defendants made these statements, Globant demand had already deteriorated to the point that it was freezing salaries and promotions for its Latin American workers (who constituted roughly 70% of Globant's workforce), and the number of employees relegated to the Dojo was steadily increasing. ¶¶38, 72-73, 77-80. Internally, the Company's declining client demand had been "in the conversation for a long time," and Company executives, including Migoya, discussed it openly at all-hands and Company-wide meetings in 2024 and 2025. ¶¶54, 58.

125. Similarly, Defendants' statement that the Company continues to see "net additions" in its workforce was, at best, materially misleading, as demand had already deteriorated to the point that it was freezing salaries and promotions for its Latin American workers (who constitute

roughly 70% of Globant's workforce), and the number of employees relegated to the Dojo was steadily increasing. (¶¶38, 72-73, 77-80).

126. The market credited Defendants' representations regarding the strength of Globant's workforce. On February 15, 2024, for example, William Blair reported that it was "positive on Globant's differentiated talent acquisition and retention strategy."

**2. May 16, 2024 First Quarter 2024 Earnings Call**

127. On May 16, 2024, Globant reported its first quarter 2024 results and held an earnings call. On that call, Defendant Urthiague stated the following regarding demand for Globant's services:

> *Our pipeline is strong and at record levels*, and *recent booking trends in the past months support our outlook.* (emphasis added).

128. Similarly, Defendant Migoya stated that Globant was taking share from competitors:

> Yes. And one thing I would like to emphasize over there is that if you see Globant and if you see some of our competitors, you will see that Globant is consistently still in market share, right? And that's a very important ability to put on the table and to act on to it. When most of them are decreasing or growing at small numbers, we're still maintaining our ability intact to get that market share. So[,] we're very proud of that. . . . *I would like to say that our growth remains pretty solid across the sectors because of that common factor of that ability of getting market share.* (emphasis added).

129. The statements detailed above (¶¶127-128) were materially false and/or misleading when made.

130. Contrary to Defendants' statements that its pipeline was "strong" and "at record levels," that "recent booking trends" supported the Company's outlook, and that "growth remains pretty solid," Globant was already losing Latin American-serviced business and experiencing weakened demand. For example, beginning in the middle of 2023 and thereafter, several of Globant's largest clients began to cancel or cut back on projects with the Company or shift work

to a competitor (*see, e.g.*, ¶¶49, 55, 59-61, 64, 66, 86, 89). Indeed, when Defendants made these statements, Globant demand had already deteriorated to the point that it was freezing salaries and promotions for its Latin American workers (who constituted roughly 70% of Globant's workforce), and the number of employees relegated to the Dojo was steadily increasing. ¶¶38, 66, 72-73, 77-80, 83. Internally, the Company's declining client demand had been "in the conversation for a long time," and Company executives, including Migoya, discussed it openly at all-hands and Company-wide meetings in 2024 and 2025. ¶¶54, 58. Also on the May 16, 2024 call, Defendant Pomies represented that Globant had launched an integration model that made its acquisitions seamless:

> Embracing our new cultural value of being cross-selling heroes, we started the year launching a novel integration model. *This model is designed to provide a seamless and streamlined experience for companies joining our family through M&A. The new transition team operates on a decentralized basis and is focused on each region, accelerating the integration process with new colleagues and ensuring more direct access to complementary business opportunities*. As an example, Sportian our joint venture with LaLiga have already booked deals involving own specific offerings along with Globant's pre-existing services. (emphasis added).

131. The foregoing statement was materially false and/or misleading when made, and omitted material facts. Globant's integration of the businesses it acquired was neither "seamless" nor "streamlined," and the process was not being "accelerat[ed]." As explained above, the integration of Iteris—the Brazilian consultancy Globant had acquired five months earlier as the centerpiece of its Latin American expansion—was so disorganized that it had resulted in the loss of "a lot of clients." (¶¶81-83, 85-87, 89-90). Other acquisitions during this time suffered from the same problems: Globant was acquiring companies to "take their revenue generation and add it to the books" without having any goal of integration, and that for "every four, one would get integrated and the other three would just be useless." (¶¶91-92).

### 3. August 15, 2024 Second Quarter 2024 Earnings Call

132. On August 15, 2024, Globant reported its second quarter 2024 results and held an earnings call. An analyst asked:

> We saw [ . . . ] an impressive reduction on the attrition rate, right? What we've been seeing with several of our–the companies we cover here such as Accenture is an improvement overall in IT services. Do you think there could be–at some point, could be an increase back again on the attrition rate or the demand for developers? How is your idle capacity regarding that?

133. Defendant Pomies responded:

> *[W]hat we are seeing right now in terms of the attrition, [it] is pretty low right now.* Of course, it has been raising a little from the last quarter, but we're still in very low rates. *What we are seeing is that the demand is still very, very high for us.* So[,] we continue hiring in many of the countries that Juan [Urthiague] explained before. *We are very strong in LatAm* as we have been in the last couple of years. (emphasis added).

134. Later, on the call, Defendant Pomies represented that hiring would increase to meet growing demand:

> As of Q2, our total head count is 29,112 Globers, up 12.2% year-over-year. Of this figure, 27,133 are IT professionals. Our utilization rate is currently 79.5%, 20 basis points up quarter-over-quarter. *As we look forward, our hiring is set to increase to meet our expanding demand.* Our attrition level over the last 12 months is currently at 8.6%, this is down from 11.6% in Q2 2023. (emphasis added).

135. The statements detailed above (¶¶133-134) were materially false and/or misleading when made.

136. Contrary to Defendants' statements in ¶¶133-134 that "our hiring is set to increase to meet our expanding demand," and attrition was "pretty low right now," demand had already deteriorated to the point that the Company was freezing salaries and promotions for its Latin American workers (who constitute roughly 70% of Globant's workforce), and the number of employees relegated to the Dojo was steadily increasing. Globant had implemented salary and

promotion freezes as early as 2022 in some countries. (¶¶38, 77). There were layoffs at Globant starting in 2024, and "entire departments were fired." (¶¶84–85, 96).

137. Contrary to Defendants' statements in ¶¶133-134 that "demand is still very, very high for us," that demand was "expanding," and that we are "very strong in LatAm," Globant was already losing Latin American-serviced business and experiencing weakened demand. For example, beginning in the middle of 2023 and thereafter, several of Globant's largest clients began to cancel or cut back on projects with the Company or shift work to a competitor (*see, e.g.*, ¶¶49, 55, 59-61, 64, 66, 86, 89). Indeed, when Defendants made these statements, Globant demand had already deteriorated to the point that it was freezing salaries and promotions for its Latin American workers (who constituted roughly 70% of Globant's workforce), and the number of employees relegated to the Dojo was steadily increasing. ¶¶38, 66, 72-73, 75, 77-80, 83. Internally, the Company's declining client demand had been "in the conversation for a long time," and Company executives, including Migoya, discussed it openly at all-hands and Company-wide meetings in 2024 and 2025. ¶¶54, 58.

138. Analysts credited Defendants' representations. On August 21, 2024, for example, Deutsche Bank observed that while many of Globant's peers had seen organic growth turn negative as information technology spending declined, Globant "has maintained strong… organic growth as the company has continued its strong execution and taken market share."

**4. November 14, 2024 Third Quarter 2024 Earnings Call**

139. On November 14, 2024, Globant reported its third quarter 2024 results and held an earnings call. On the call, Defendant Migoya again described strong demand across all the Company's regions:

> This quarter, we brought in $614.7 million in revenue. That's a 4.6% growth from the last quarter and 12.7% more than the same time last year. *We see strong demand*

> *in our main sectors with our top clients and across different regions. We're growing our market share everywhere.* (emphasis added).

140. When an analyst asked for more detail on Latin America, Defendant Pomies represented that the region was growing:

> I can explain the thing about—well, in terms of LatAm, as we have been explaining before, we split the region in [two] right now. We put [two] heads there, one in Brazil and the other one in Mexico. *What we are seeing there is that we are slightly growing year-over-year now.* We'll start growing faster. In terms of the financial vertical, it's getting better there. And some other, consumer and retail, are growing fast. . . . And in terms of the M&A strategy, as you know, we are all the time looking for the best talent and opportunities. Right now, what we are seeing is what we have is in the pipeline is okay. We are, right now, great—in a great scenario. Probably, I mean, we are looking for some new spaces all the time. Of course, also in LatAm in Europe. Mainly, what we are focusing these days is in organic growth there also. (emphasis added).

141. Similarly, when asked about sales-cycle elongation and deal delays, Defendant Urthiague denied that Globant was seeing any deterioration at all:

> Jonathan, no, we are seeing a similar scenario like the one we've seen over the last few quarters. That's why the numbers are pretty much not changing. . . . *We are also not seeing deterioration in budgets for '25 at our customers.* I mean it doesn't mean that they are growing a lot, but it's unlikely—I mean we see pretty much no customers targeting a lower number for next year in their investment in technology. So[,] in general, I would say that we are not seeing elongated closing cycles. *We are not seeing any further–any deterioration.* (emphasis added).

142. Defendant Migoya again touted the alleged then-existing strength of Globant's pipeline, stating:

> For 2025, we're confident about double-digit revenue growth, *thanks to a strong pipeline and faster organic growth.* (emphasis added).

143. The statements detailed above (¶¶139-142) were materially false and/or misleading when made.

144. Contrary to Defendants' statements in ¶¶139-142 that the Company was seeing "strong demand," "growing" its market share, seeing "faster organic growth," there was no "deterioration," and the pipeline was "strong," Globant was already losing Latin American-

serviced business and experiencing weakened demand. For example, beginning in the middle of 2023 and thereafter, several of Globant's largest clients began to cancel or cut back on projects with the Company or shift work to a competitor (*see, e.g.*, ¶¶49, 51-53, 55, 59-61, 64, 66, 69, 86, 89). Indeed, when Defendants made these statements, Globant demand had already deteriorated to the point that it was freezing salaries and promotions for its Latin American workers (who constituted roughly 70% of Globant's workforce), and the number of employees relegated to the Dojo was steadily increasing. ¶¶38, 66, 71-73, 75, 77-80, 83. Internally, the Company's declining client demand had been "in the conversation for a long time," and Company executives, including Migoya, discussed it openly at all-hands and Company-wide meetings in 2024 and 2025. ¶¶54, 58.

145. Analysts relied on these assurances. On November 15, 2024, Canaccord Genuity wrote that Globant's third-quarter results "underscore another solid quarter of growth," and that Globant's updated full-year outlook "demonstrat[ed] its business model efficiency and pricing power." In truth, as set forth above, Globant's clients were reducing their engagements and moving work to lower-priced competitors precisely because of Globant's high rates. ¶¶59-61, 86, 89.

#### 5. February 20, 2025 Fourth Quarter 2024 Earnings Call

146. On February 20, 2025, Globant reported its earnings for the quarter and year ended December 31, 2024. As discussed at §IV.C.2 above, Defendants' reported results and commentary partially revealed the deterioration in Globant's Latin American business, causing Globant's stock price to decline sharply. But the disclosure was only partial, and it was accompanied by further false and misleading statements that kept the fraud alive.

147. For instance, Defendant Migoya attributed the decline in Latin America to political turmoil, and assured investors that the region was stabilizing:

> In Latin America, the situation is a little bit more stable now. It used to be during 2024, a little bit rocky there because of the political turmoil and different things that happened in Brazil and in Colombia, mainly. *But I think now that it looks like a little bit more healthy in terms of the pipeline, the conversion*. (emphasis added).

148. On the same call, an analyst asked directly about Globant's growth. Defendant Migoya responded:

> *I believe that is a top-notch performance for the industry*. And there's a lot of shifts that are happening. And with an already large company and different types of engagements, *I think we are delivering the organic growth in the same level of last year, which was a record*, taking us to record EPS growth and *record revenue growth*. I think it's very—it speaks by itself our readiness of—to be ready for what's coming on the industry. So that's the color I wanted to add. (emphasis added).

149. The statements detailed above (¶¶147-148) were materially false and/or misleading when made. Contrary to Defendants' statements in ¶¶147-148, the pipeline was not "healthy." Nor was the Company delivering "organic growth at the same level of last year." Globant was already losing Latin American-serviced business and experiencing weakened demand. For example, beginning in the middle of 2023 and thereafter, several of Globant's largest clients began to cancel or cut back on projects with the Company or shift work to a competitor (*see, e.g.*, ¶¶49, 51-53, 55, 59-64, 66-69, 86, 89). Indeed, when Defendants made these statements, Globant demand had already deteriorated to the point that it was freezing salaries and promotions for its Latin American workers (who constituted roughly 70% of Globant's workforce), and the number of employees relegated to the Dojo was steadily increasing. ¶¶38, 63, 66, 69, 71-73, 75, 77-80, 83. Internally, the Company's declining client demand had been "in the conversation for a long time," and Company executives, including Migoya, discussed it openly at all-hands and Company-wide meetings in 2024 and 2025. ¶¶54, 58. Three months later, Globant missed its own first-quarter revenue guidance and cut its full-year guidance by roughly $200 million.

150. Analysts accepted Defendants' attribution of the Latin American decline to external political and macroeconomic conditions, rather than to Globant's own internal problems. On February 21, 2025, UBS reported that "[t]he main detractors to FY25 guidance were LatAm's current macro/political volatility." On February 23, 2025, Canaccord Genuity similarly wrote that "political and macro uncertainty in Mexico and Brazil are impacting demand in LatAm." And on March 5, 2025, Deutsche Bank reported that Globant's growth was being offset by "increasing macro/political uncertainty across several countries in LatAm that began in 2H24," noting that Globant had pointed to "fiscal deficit issues and a higher rate environment in Brazil, Supreme Court reform and tariffs in Mexico, and new government actions to raise taxes on wealthier individuals in Colombia."

151. Defendant Pomies represented that Globant had "surpassed a special milestone of 30,000 Globers throughout the world," and assured investors that Globant was hiring in every region, representing that:

> *Across each region, we are hiring industry-leading talent in key growth sectors* that include airlines, BFSI, travel and hospitality, among others. (emphasis added).

152. However, these statements were materially false and/or misleading when made. As set forth above (¶¶71-75, 78, 85, 96-100, 114), the Company's Latin American workforce was shrinking, offices were being closed, the Company had an expanding practice of pushing Latin American employees out the door by moving them into the "Dojo," and the Company was on the verge of implementing a formal restructuring program focused on slashing the Company's workforce. Indeed, as FE-12 stated, Globant had been hiring "non-billable staff" and had "over-hired," creating roles "for the hell of it to show the market they were growing," even as she saw demand for Globant's services declining. Within two months of Defendant Pomies' statement,

Globant initiated a "Business Optimization Program" started in April 2025 that it later described as "primarily related to workforce resizing and office reductions."

153. Analysts likewise relied on Defendants' representations regarding Globant's workforce. On February 20, 2025, Santander reported that "Globant increased their staff of IT professionals 7.7% YoY." And on March 5, 2025, Deutsche Bank reported that while Globant's "headcount growth is expected to be flat to slightly down in 1Q25," "the company plans to accelerate hiring into 2H25" – not that Globant was preparing to restructure and reduce its workforce, as it began to do the following month.

**6. May 15, 2025 First Quarter 2025 Earnings Call**

154. On May 15, 2025, Globant reported disappointing results for its first quarter 2025. As discussed at §IV.C.3 above, Defendants' reported results and commentary partially revealed the continued deterioration of Globant's Latin American business, causing Globant's stock price to decline sharply. But this disclosure, too, was only partial, and it was accompanied by further false and misleading statements that kept the fraud alive.

155. During the conference call that followed, analyst Divya Goyal asked Defendant Migoya whether Globant was undertaking or anticipated undertaking any restructuring efforts in any of the global geographies in which it operated. Migoya answered: "*No*." Following up on Migoya's denial, Defendant Urthiague confirmed that no restructuring efforts were in the cards, stating:

> *No, Divya, not in the plan*. We see a lot of, as Martin [Migoya] described, the pipeline is there, the need for technology is there . . . . (emphasis added).

156. Defendants' restructuring denials in ¶155 were materially false and/or misleading when made, and omitted material facts. Three months after this call Globant disclosed that it had recorded a $47.6 million charge for "the Company's Business Optimization Program initiated in

April 2025," which it described as "primarily related to workforce resizing and office reductions." By Globant's own account, the restructuring program that Defendants Migoya and Urthiague denied had begun the month before they denied it.

157. Former employees confirm that the restructuring had been communicated internally months before Migoya and Urthiague publicly denied any such plans. FE-16 recalled that at the beginning of 2025 there was a large executive on-site meeting, which FE-16 recalled took place in Miami in or around January 2025, and that after this meeting her boss told her that leadership had informed her boss that cuts would need to be made across all teams and advised her to begin looking for another job. FE-14 recalled internal discussion about the likelihood of layoffs and related restructuring between March and June 2025, and that a large layoff of approximately 1,500 people occurred during that time period, mostly developers. When layoffs actually began in the second quarter of 2025, FE-7 stated that, the decisions originated from Argentina and were largely based on employees' Dojo status rather than seniority or performance, and each area of the business was required to reduce a certain percentage of employees in the Dojo. And as FE-18 confirmed, many of the employees she knew who were laid off were not actively staffed on projects and were assigned to the Dojo.

**E. Additional Scienter Allegations**

158. As detailed herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and/or misleading; knew or recklessly disregarded that such false and misleading statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such false and misleading statements or documents as primary violations of the federal securities laws.

159. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading and omitted such information. As a result, each of the Defendants was responsible for the accuracy of Globant's corporate statements and is therefore responsible and liable for the misrepresentations of and omissions from such statements.

**1. The Layoffs, Wage Freezes, and Other Cost-Cutting Measures Were Company Wide Decisions Authorized by Globant's Top Executives to Address a Drop in Demand**

160. The Individual Defendants served as the Company's CEO (Migoya), CFO (Urthiague), or COO (Pomies). Because of their high-ranking positions within the Company, they were responsible for, and remained well-informed of, issues critical to the Company's success, including the Company's Latin American business and operations. Indeed, FE-5 stated that at all-hands and Company-wide meetings in 2024 and 2025, executive management, including Defendant Migoya himself, "never shied away" from discussing the Company's declining client demand: "internally, these were topics that were in the conversation for a long time, maybe [the executives] explanations for the declines weren't fully satisfactory, but they were discussed, it was no secret." Publicly, however, on earnings calls, the Company did "shy away" from these issues; as FE-5 put it, "*they were not telling the market*."

161. The deterioration in Defendants' business that triggered widespread layoffs and wage freezes began in 2023, well before Defendants began emphasizing to the market the Company's "growth" and "strong" pipeline, and that it would "continue hiring" to meet demand for its services. The FEs confirm that Globant tracked the decline in demand internally in real time. Specifically, the Company used Salesforce, a customer relationship management ("CRM")

software program used by companies to track current and potential customers, to log prospective client engagements and track incoming "tickets" for projects, which included the client's name, the number of roles needed, and other relevant information for the project. The Company also maintained staffing rates internally, treated employee utilization (i.e., which employees were actively staffed to a client project) as a key performance indicator that was broadly visible within the organization, and made every employee's project assignment and bench status visible Company-wide through StarMeUp. The FE accounts also reveal that while Globant was reporting strong results publicly, sales teams were actually missing their internal targets.

162. Defendants Migoya and Pomies demonstrated familiarity with these applications in their comments to investors during earnings calls. On a November 16, 2023 earnings call, Defendant Pomies discussed the StarMeUp application: "we launched a unique tool within StarMeUp to promote self-awareness and to help Globers overall well-being. This tool interacts with Globers using a series of questions and provides recommendations for improvement. In less than a month, over 30% of Globers already utilized the tool." Defendant Migoya also discussed StarMeUp on the same call: "With StarMeUp, we help organizations foster culture, predict attrition, and build community. These new trends in Globant platforms have the opportunity to connect with our expanded value offering." On a February 15, 2024 call, Defendant Migoya stated that, "On the enterprise side, we see very good growth coming from Salesforce. . . ."

163. FE-5 recalled that promotion freezes, salary increase freezes, relocation freezes, and re-categorization freezes existed in Argentina beginning around 2022. According to FE-5, hiring freezes and promotion restrictions remained recurring features of the company's operating environment after 2022.

164. FEs recount how Globant management was directly involved in postponing and canceling employee raises and promotions. For instance, FE-3 stated that colleagues in the office requested raises and promotions, but even when approved, they were postponed and eventually cancelled and that management was unclear about the reasons, only saying "it was not good times." FE-3 further stated that Globant management wanted to decrease and cut salaries to economize costs and avoid layoffs. Additionally, according to FE-3, in late 2023, during an office-wide meeting with Defendant Migoya, employees asked about raises. Migoya told them Globant was "working on it."

165. Before long, the layoffs spread to Latin America. These were not isolated events, but rather, Company-wide reductions in its workforce.

166. According to FE-7, the decisions to reduce the workforce originated from Argentina. Each area of the business was required to reduce a certain percentage of employees in the Dojo.

167. According to FE-16, in or around January 2025, there was a large executive on-site meeting in Miami. After this meeting, FE-16's manager stated that leadership had informed her manager that cuts would need to be made across all teams, further evidence that these decisions were made by Globant's C-suite.

**2. Defendants' Public Statements Confirm that They Were Knowledgeable About the Very Topics on Which They Misled Investors**

168. The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding employee headcount and retention, the utilization and acceptance of the Company's offerings, the competitive conditions in Latin America, the effect of foreign currency exchange rates on the Company's ability to be competitive by arbitraging lower employee wages and thus offer lower rates to clients, and its ability to market and sell its technology services to its

clients. The alleged fraud herein directly concerns the operational results and financial health for its software development and digital services.

169. Defendants discussed these issues repeatedly on industry and earnings conference calls during the Class Period. In particular, Defendant Migoya spoke frequently about the competitiveness of and demand for Globant's services and the Company's performance. For example: (i) on November 16, 2023, Migoya stated, "We now have over 1,200 employees in Brazil and the management team for the LatAm operation is based out of Sao Paulo."; (ii) on May 16, 2024, Migoya emphasized the Company's presence in 33 countries, and the Company's "right presence in both talent and client markets that are resilient and growth oriented in this time of macroeconomic and geopolitical uncertainty. First, Latin America, the region where we were born and currently home to 69% of our workforce. In Latin America, the IT services sector is expected to grow 11% in 2024. By 2027, the region's 5,000 largest companies may spend an estimated 25% of their budget on IT according to Gartner."; (iii) on August 15, 2024, Migoya stated, "AI-related revenues are growing close to 130% in the first half of 2024 versus the same period last year. During the first half of this year, we have produced over $150 million of revenue that included AI workloads, far above the $100 million in revenues that we reported in November last year"; and (iv) on February 20, 2025, Migoya stated, "In Latin America, the situation is a little bit more stable now. It used to be during 2024, a little bit rocky there because of the political turmoil and different things that happened in Brazil and in Colombia, mainly. But I think now that it looks like a little bit more healthy in terms of the pipeline, the conversion."

170. Defendant Pomies, the Company's COO, also spoke frequently about the competitiveness of and demand for Globant's services and the Company's performance. On investor calls before and during the Class Period, Pomies addressed the Company's headcount and

attrition in detail. For example, (i) on November 16, 2023, Pomies addressed the Company's headcount and attrition, "Now into our headcount. As of September 30, we were 27,505 Globers, of which 93% are IT professionals, representing an addition of 1,412 IT professionals on a sequential basis… Our attrition rate for the last 12 months is 9.5%, decreasing 2.1 percentage points versus last quarter and the lowest in our history. The attrition over Q3 was 2.2%."; and (ii) on February 15, 2024, Pomies similarly addressed the Company's growing headcount, "record low" attrition, and utilization rate, which, as Pomies put it, "continue to have positive net additions on an organic basis, which is a reflection of the demand we see." Pomies later added on the August 15, 2024 call that "[w]hat we are seeing is that the demand is still very, very high for us." Pomies made similar statements during investor calls on August 15, 2024 and February 20, 2025 in representing to investors the market for the Company's services is still "growing."

171. Defendant Urthiague, the Company's CFO, likewise held himself out as knowledgeable on the competitiveness of and demand for Globant's services and the Company's performance.

(a) Urthiague repeatedly demonstrated his knowledge of the impact of fluctuations in foreign currency on the Company's business, the economic conditions in Latin America, employee headcount, and employee costs. For example: (i) on February 15, 2024, Urthiague stated, "Yes. So no, unfortunately, the effects in Colombia, the effects in Mexico, in Brazil, it continues to—it's stable. So[,] it has not deteriorated further, but the trend has not changed. It's just stable, just where it was during Q3 and Q4. So[,] we continue to have those headwinds in front of us. And we expect—at this point, we expect our margins to be stable relative to 2023 throughout 2024"; and (ii) on May 16, 2024, Urthiague indicated that "things are

improving in Argentina. They are getting more stable. Of course, back in December, there was a depreciation that, as we discussed in the last quarter had an impact on our Q1 revenues. The impact was around $15 million in that quarter. We already closed around $10 million of those $15 million. So[,] we still have about $5 million in our Q2 numbers that depending on each negotiation with our customers will get fully sold or partially sold, but we are—we made very, very good progress compared to where we were back in towards the end of December. Customers understood the situation."

(b) In terms of headcount, on August 15, 2024, Urthiague stated "[s]o yes, we are expecting to continue with sequential growth in terms of head count. In second quarter, IT professionals grew by about 200 net additions, and we expect to continue having positive net additions for the rest of the year. In terms of regions, we have seen—we are seeing Argentina, Colombia and India as well showing good growth. And it's a reflection of our position in those markets and us being the most relevant player in Latin America." Urthiague made similar comments on a November 14, 2024 call, highlighting the "net additions [of employees]" and "hiring in the 3 regions," and telling the market to "keep on expecting positive net additions in terms of – and probably a little bit faster than Q3."

### 3. Insiders Realized Approximately $33.9 Million in Proceeds from Their Class Period Stock Sales

172. Throughout the Class Period, the Individual Defendants were motivated to issue false statements to give themselves the opportunity to sell their common stock at artificially inflated prices before the truth emerged.

173. In total, eight insiders dumped at least 167,279 shares of stock during the Class Period for approximate proceeds of over $33,929,754. However, Lead Plaintiffs cannot determine the full extent of insider sales by the Individual Defendants and senior executives during the Class Period prior to discovery. Globant executives planning to sell unregistered shares of Company stock were required to file a Form 144 with the SEC, which provides notice of a proposed sale of securities.[3]

174. As reflected in Forms 144 filed with the SEC and as set forth below, during the Class Period, the Individual Defendants noticed their intent to sell at least $15,699,529 of their shares, as summarized in the following chart:

| Filer Name | Role | Transaction | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Martin Migoya** | CEO and Co-Founder | 3/5/2024 | 15,000 | $3,225,300 |
| | | 6/5/2024 | 10,000 | $1,543,500 |
| | | 6/12/2024 | 15,000 | $2,351,250 |
| | | 9/12/2024 | 10,000 | $2,017,700 |
| | | 12/12/2024 | 10,000 | $2,205,000 |
| **Juan Ignacio Urthiague** | Chief Financial Officer | 8/16/2024 | 2,779 | $540,154 |
| | | 11/20/2024 | 2,500 | $521,375 |
| **Patricia Pomies** | Chief Operating Officer | 11/21/2024 | 10,000 | $2,157,000 |
| | | 12/10/2024 | 5,000 | $1,138,250 |
| Nestor Nocetti | EVP of Corporate Affairs, Co-Founder | 8/26/2024 | 19,000 | $3,872,770 |
| | | 12/26/2024 | 7,000 | $1,536,220 |

[3] Section 16 of the Exchange Act requires officers, directors, and large shareholders ("insiders") of U.S. public companies to disclose changes in their ownership of their company's stock on a Form 4. Following an insider transaction subject to Section 16, a Form 4 detailing the amount of the transacted securities and the price per share must be electronically filed with the SEC within two business days.

Foreign private issuers, like Globant, with securities traded on a U.S. exchange, however, are exempted from Section 16's heightened reporting requirements. Instead, a foreign issuer is only required to report insider transactions via a Form 144 when an affiliate of the issuer seeks to resell restricted securities during any three-month period in a transaction that either (i) exceeds 5,000 shares or (ii) has an aggregate sales price of more than $50,000. A Form 144 is a pre-sale notice of intent. And, unlike with Form 4, there is no requirement that Form 144s have to be filed electronically within two business days. Because of this, many foreign issuer insider transactions never get reported to the SEC and the insider transactions that do get reported are not promptly disclosed to the market.

| | | | | |
|---|---|---|---|---|
| Diego Tartara | Global Chief Technology Officer | 8/28/2024 | 1,500 | $303,960 |
| | | 12/11/2024 | 8,500 | $1,870,000 |
| Wanda Weigert | Global Chief Brand Officer | 3/1/2024 | 2,500 | $557,925 |
| | | 12/11/2024 | 7,500 | $1,663,950 |
| Yanina Maria Conti | Corporate Financial Controller & Senior Director | 12/4/2024 | 1,000 | $224,400 |
| Guibert Englebienne | Co-Founder, President of Globant X and Globant Ventures | 9/11/2024 | 30,000 | $5,970,000 |
| | | 12/11/2024 | 10,000 | $2,231,000 |

175. As alleged above, at the time Defendants made the foregoing sales, they were aware of material non-public information, specifically, that Globant intended to significantly cut its staff, and freeze wages and promotions, and that there already existed a substantial decline in client demand for the Company's IT services.

176. Many of the sales were made between June and December 2024, when the stock was trading at $180 to $220 per share as Defendants were materially inflating the Company's revenues by falsely assuring investors that demand for the Company's information technology services was growing.

#### 4. Heavy Executive Turnover Supports a Strong Inference of Scienter

177. The heavy turnover in senior leadership at Globant further bolsters an already compelling inference of scienter, including the departures of its COO and the Company's Chief Growth Officer.

178. Beginning in early 2025, after client and project losses had accelerated, a wave of executive departures began. In less than one-and-half years, at least 38 executives left the Company—many of them in charge of sales, growth, and operations. These departures began on

February 19, 2025, one day before the market first started to learn of the Company's Latin America struggles.

179. By the end of the next quarter, the following executives had left: Maite Barrera, Bluecap CEO, a Globant Division & Member of Globant's Executive Committee; Jeff Klebine, EVP, Transformation; Armando David Ortigosa, CEO KTBO, a Globant Company; Santanu Chowdhury, Vice President of Sales; Karl Norman, CEO Ewave, a Globant Company; Ignacio Iglesias, Chief Business Officer Latin America; Valeria Abadi, Senior Vice President Brand Global; Sebastian Jespersen, MD Globant GUT US; Ina Mainetti, VP of Technology; Pablo Stefanini, VP, Head of Strategic Growth; Santiago Piacenza, Vice President Delivery & Operations; Alfredo Rubina, SVP Financial Services Industry; Matias Ezequiel Ekerdt, Solutions Architect; and Kefreen Batista, Vice President of Technology.

180. This wave included Defendant Pomies, who resigned two weeks before the August 14, 2025 disclosure. Defendant Pomies, one of Globant's highest-level executives, had served as the Company's Chief Operating Officer since 2019 and been with the Company for 12 years. Pomies' departure came just two weeks before the Company announced a headcount reduction and a $47.6 million restructuring charge that triggered a roughly 15% drop in share price. Notably, the Company made the change without having arranged for a replacement COO and instead distributed her responsibilities across a number of departments for the next year, until it eventually found a successor to fill her role. In a note to investors issued on July 30, 2025, UBS analysts stated that Pomies' departure "[m]ay not be viewed as a great signal amid the context of weak revenue growth and the market moment of the stock . . . as Ms. Pomies was very present in calls with the market and was an important member of top management, in our view."

181. Within months of the August 14, 2025 disclosure, and by the end of the year, another wave of high-profile executives had also left the Company. Keith O'Neill, the Company's Chief Growth Officer, Commercial Services, announced his departure in September 2025. Patrick Gardella, Chief Technology Officer, Senior Vice President of Technology, announced his departure in October 2025. The following executives also left: Shivraj Sabale, Country Head, India; Avijeet Dutta, VP/Senior Director; Agustin Lamas, CSO HLS AI Studio; Everton Lins, Data & AI Subject Matter Expert; Basia Coulter, Partner, Healthcare & Life Sciences; Gustavo Fragoso, Head of Growth Strategy; Vivian Sauksteliskis, Chief Delivery Officer; and Stephen Terry, EVP - Lead-to-Revenue Transformation.

182. When the dust settled, at least 17 executives departed during the Class Period and following the Company's disclosure of its troubles to the market.

183. The sheer number and timing of the departures of these Globant executives—many of whom held a position central to the fraud—supports scienter.

### 5. Outsourcing IT Services Through Labor-Arbitrage Was Globant's Core Operation and Competitive Advantage

184. Defendants' knowledge of or reckless disregard of the fraud alleged herein can readily be inferred because these operations were existential to the Company's business and the material information concealed from investors were topics the Individual Defendants claimed to know about during investor conference calls held throughout the Class Period.

185. Globant is fundamentally a global technology provider that specializes in delivering software solutions and digital transformation services to businesses by creating custom software for them. It primarily services clients in the United States and Latin America. According to its Annual Report for the year ended December 31, 2023, 59.5% of Globant's revenues were generated by clients in North America, 22.1% in Latin America, 15.4% in EMEA and 3.0% in

Asia and Oceania. For the year 2023, the Company derived 81.6% of its revenues from clients in North America and Latin America pursuant to contracts that are entered into by our subsidiaries located in the United States, Argentina, Chile, Mexico, Brazil, Canada, Peru, and Colombia.

186. The company was founded, headquartered, and predominantly staffed in Latin America. The Company's workforce is mainly located in Latin America and to a lesser extent in India, Europe, and the U.S. During the relevant period, approximately 70% of Globant's headcount was located in Latin America.

187. Because the majority of its personnel are located in Latin America, Globant leverages Latin America's extensive talent pool not merely for cheap labor, but for high-value, nearshore technical depth.

188. Critical to the Company's success during the relevant period was its ability to obtain a steady stream of discrete digital transformation projects billed on a time-and-materials or fixed-price basis. This required constant hiring to scale revenue and maintaining high utilization rate of those employees with clients.

189. Given the nature of Globant's business, analysts tracked and paid close attention to its employee headcount, carefully tracking changes from quarter to quarter to assess demand for the Company's services. Market analysts often remarked on the effect of headcount on the value of Globant's business and its outlook going forward. In a January 29, 2024 analyst note, TD Cowen stated, "Encouragingly, modest organic net headcount adds are expected to continue, a differentiated bullish signal." Deutsche Bank, in a February 3, 2025 note, indicated, that, "While the company should see a contraction in organic revenue, it still expects to add headcount, which we view as a key leading indicator for growth."

190. Defendants' knowledge of or reckless disregard of the fraud alleged herein can readily be inferred because these operations were existential to the Company's business and the material information concealed from investors were topics the Individual Defendants claimed to know about during investor conference calls held throughout the Class Period.

**F. Loss Causation and Economic Loss**

191. Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic losses suffered by Lead Plaintiffs and the members of the Class (as defined herein). During the Class Period, Lead Plaintiffs and the other Class members purchased Globant common stock at artificially inflated prices made by Defendants' misconduct, as alleged herein.

192. During the Class Period, Defendants made materially false and/or misleading statements and engaged in a fraudulent scheme and course of conduct that artificially inflated the price of Globant's securities and operated as a fraud or deceit on Class Period purchasers of Globant's common stock by materially misleading the investing public. Later, as Defendants' prior misrepresentations and fraudulent conduct and/or the effects thereof gradually emerged and became apparent to the market, the price of Globant common stock materially declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Globant's common stock during the Class Period, Lead Plaintiffs and the other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

193. Globant's stock price fell in response to the corrective events, as alleged *supra*. On these dates, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Globant's business.

194. For example, as further detailed in §IV.C above, on February 20, May 15, and August 14, 2025, Globant issued disclosures that contradicted previous statements about its then-current business operations and financial health, including the purportedly strong demand for its

services. These disclosures caused Globant's stock price to decline as the artificial inflation caused by Defendants' prior misleading statements began to dissipate. In response to each disclosure, Globant's stock price declined materially and caused damages to investors.

### G. Applicability of the Fraud-on-the-Market and Affiliated Ute Presumptions of Reliance

195. The market for Globant common stock was open, well developed, and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices throughout the Class Period. Lead Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities, and have been damaged thereby.

196. During the Class Period, the artificial inflation in the value of Globant common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Lead Plaintiffs and the other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements about the Company's business, operations and condition, including about the purportedly strong demand for its services, causing the price of the Company's common stock to be artificially inflated at all relevant times. However, as the truth was disclosed in a series of partial disclosures as alleged herein, these disclosures drove down the value of the Company's common stock, causing Lead Plaintiffs and the other Class members that had purchased Globant common stock at artificially inflated prices to suffer damages.

197. At all relevant times, the market for Globant common stock was efficient for the following reasons, among others:

(a) Globant common stock met the requirements for listing and was listed and actively traded during the Class Period on the NYSE, a highly efficient market;

(b) Globant communicated with public investors via established market communication mechanisms, including through dissemination of press releases via major newswire services and hosting at least quarterly calls with analysts and investors, as well as through communications with the financial press and other similar reporting services;

(c) Globant was followed by multiple securities analysts employed by major brokerage firms who wrote reports that were distributed to investors and other market participants during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Globant was promptly reflected in and incorporated into the Company's stock price during the Class Period.

198. As a result of the foregoing, the market for Globant common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Globant's stock price. Under these circumstances, all purchasers of Globant common stock during the Class Period suffered similar injury through their purchase of Globant common stock at artificially inflated prices, and a presumption of reliance applies.

199. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as it is sufficient to show, as here, that the facts withheld were material in that a reasonable investor would have considered the omitted information important in deciding whether to buy or sell the subject security.

**H. No Safe Harbor**

200. The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, the statements challenged herein are statements of then-existing fact, or contain severable assertions of then-existing fact, and thus fall outside the safe harbor entirely. Moreover, even to the extent that any statement (or part thereof) may be properly characterized as forward-looking, the safe harbor is unavailable as to that statement (or part thereof) because any accompanying cautionary language was not meaningful, but rather remained generic and static, and/or warned only that the identified risks "may" or "could" materialize even though such risks had already materialized.

201. Defendants are in any event also liable to the extent that any statements at issue are deemed "forward-looking" because, at the time such statements were made, the speaker knew that they were materially false and/or misleading, and/or the "forward-looking" statement was authorized or approved by an executive officer of Globant who knew that the statement was materially false and/or misleading.

**I. Class Action Allegations**

202. Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Globant common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants, the officers, and directors of the Company at all relevant times, the members of each such excluded person's immediate family and their respective legal representatives, heirs, successors or assigns, and any entity in which any of the above excluded persons have or had a controlling interest.

203. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Globant common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and the other members of the Class may be identified from records maintained by Globant or its transfer agent, who may be notified of the pendency of this action by mail and email using forms of notice similar to those customarily used in securities class actions. As of December 31, 2024, there were 44,029,319 shares of the Company's common stock outstanding. Upon information and belief, these shares are held by or on behalf of thousands, if not tens of thousands, of Class members located throughout the United States and abroad, making joinder impracticable.

204. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by Defendants' violation of the federal securities laws and wrongful course of conduct as alleged herein.

205. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

206. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws, as alleged herein;

(b) whether Defendants' Class Period statements to the investing public misrepresented material facts about the business, operations, and management of Globant;

(c) whether the Individual Defendants caused Globant to issue false and misleading statements of material fact during the Class Period;

(d) whether the price of Globant common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(e) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

207. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Against All Defendants for Violations of**
**<u>Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder</u>**

208. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

209. This Count is asserted against each Defendant and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

210. During the Class Period, Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud or deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such plan, scheme, and course of conduct was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Globant common stock; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase or otherwise acquire Globant common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

211. Pursuant to the above plan, scheme, and course of conduct, each Defendant participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements identified above, including statements made to securities analysts and market participants, which were designed to and did influence the market for Globant common stock. Such reports, filings, releases, and statements were materially false and/or misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and its business and operations.

212. By virtue of their positions at Globant, Defendants acted with actual knowledge of the materially false and/or misleading statements and material omissions as alleged herein or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and/or misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In

addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

213. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Globant's business, operations, condition, and prospects. As a result of the aforesaid plan, scheme, and course of conduct, and/or the dissemination of the aforementioned materially false and misleading reports, releases, and public statements, the market price of Globant common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts about the Company that Defendants concealed, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Globant common stock at artificially inflated prices in reliance on the integrity of the market for such shares and/or on the materially false and/or misleading statements disseminated by Defendants and were damaged thereby.

214. During the Class Period, Globant common stock traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and/or misleading statements described herein and/or the integrity of the market, purchased or otherwise acquired Globant common stock at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said stock or would not have purchased or otherwise acquired it at the inflated prices that they paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Globant common stock was substantially lower than the

prices paid by Lead Plaintiffs and the other members of the Class. The market price of Globant common stock declined sharply upon the corrective disclosure events as alleged herein, to the injury of Lead Plaintiffs and the other Class members.

215. By reason of the conduct alleged herein, Defendants, knowingly or recklessly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

216. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Globant common stock during the Class Period.

## COUNT II

### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

217. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

218. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated in, directly and indirectly, the Company's business affairs. Because of their senior management positions, they knew of (or recklessly ignored) the adverse non-public information about Globant that rendered the statements at issue herein materially false and/or misleading, and each also exercised control over the general operations of the Company and had the power to control the specific activities that were the subject of those statements.

219. As officers and/or directors of a publicly traded company, the Individual Defendants had a duty to disseminate accurate and truthful information about the Company, and to correct promptly any public statements issued by Globant which had become materially false or misleading.

220. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control, directly or indirectly, the contents of the various reports, press releases and public filings that Globant disseminated in the marketplace during the Class Period, including the false and/or misleading statements at issue. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act, and throughout the Class Period exercised their power and authority to cause Globant to engage in the wrongful acts complained of herein and participated in the unlawful conduct alleged herein that artificially inflated the price of Globant common stock.

221. By reason of the above conduct, the Individual Defendants and/or Globant are liable pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, and certifying Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and The Office of the Treasurer as Trustee for the State of Connecticut Retirement Plans and Trust Funds Class representatives;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post- judgment interest, plus their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

Dated: October 22, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Steven M. Jodlowski
Steven M. Jodlowski
600 West Broadway, Suite 330
San Diego, CA
Tel.: (619) 233-4565
Fax: (619) 233-0508
sjodlowski@scott-scott.com

William C. Fredericks
Nicolas Apter-Vidler
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
wfredericks@scott-scott.com
napter-vidler@scott-scott.com

Kaitlyn R. Lombardi (*pro hac vice forthcoming*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 156
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
klombardi@scott-scott.com

*Counsel for Lead Plaintiffs and the Proposed Class*

Karin E. Fisch
Vincent J. Pontrello
Cecilia E. Stein
Mica A. Cocco
**GRANT & EISENHOFER P.A**.
485 Lexington Avenue

New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
kfisch@gelaw.com
vpontrello@gelaw.com
cstein@gelaw.com
mcocco@gelaw.com

*Counsel for the State Pension Funds and Co-Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2026 I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on October 22, 2026, at San Diego, California.

/*s*/ Steven M. Jodlowski
Steven M. Jodlowski